215 F.3d 11 (D.C. 2000)
 Local 702, International Brotherhood of Electrical Workers, AFL-CIO, Petitioner
v.
National Labor Relations Board, Respondent
Central Illinois Public Service Company, Intervenor
International Union of Operating Engineers, Local 148, AFL-CIO, Petitioner
v.
National Labor Relations Board, Respondent
Central Illinois Public Service Company, Intervenor
 No. 99-1137, No. 99-1139
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued January 19, 2000
Decided May 9, 2000
 
 [Copyrighted Material Omitted]
 On Petitions for Review of an Order of the National Labor Relations Board
 Marilyn S. Teitelbaum argued the cause for the petitioners in Nos. 99-1137 and 99-1139. Stacey A. Meyers was on brief for Local 702, International Brotherhood of Electrical Workers, AFL-CIO, the petitioner in No. 99-1137.
 Cary Hammond and Greg A. Campbell were on brief for petitioner International Union of Operating Engineers, Local 148, AFL-CIO in No. 99-1139.
 Julie B. Broido, Attorney, National Labor Relations Board, argued the cause for the respondent. Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Margaret A. Gaines, Attorney, National Labor Relations Board were on brief for the respondent. John D. Burgoyne, Deputy Associate General Counsel, National Labor Relations Board, entered an appearance.
 Stuart I. Cohen and Robert S. Seigel were on brief for intervenor Central Illinois Public Service Company in Nos. 99-1137 and 99-1139.
 Jonathan P. Hiatt, Larry Engelstein, James B. Coppess, Victoria L. Bor and Sue D. Gunter were on brief for amici curiae American Federation of Labor-Congress of Industrial Organizations, International Brotherhood of Electrical Workers and International Union of Operating Engineers in Nos. 99-1137 and 99-1139.
 Robert E. Williams, Daniel V. Yager, Heather L. MacDougall, Jan S. Amundson, Quentin Riegel, Stephen A. Bokat and Robin S. Conrad on brief for the amici curiae LPA, Inc., National Association of Manufacturers and the Chamber of Commerce of the United States of America in Nos. 99-1137 and 99-1139.
 Before: Henderson, Randolph and Garland, Circuit Judges.
 Opinion for the court filed by Circuit Judge Henderson.
 Karen LeCraft Henderson, Circuit Judge:
 
 
 1
 Local 702 and Local 148 of the International Brotherhood of Electrical Workers, AFL-CIO (collectively Unions) challenge a decision of the National Labor Relations Board (NLRB, Board) holding that the Central Illinois Public Service Company (CIPS) did not commit an unfair labor practice when it locked out its employees during contract negotiations. CIPS, 326 N.L.R.B. No. 89, 1998 WL 600788 (Aug. 27, 1988). Reversing the decision of the administrative law judge (ALJ), the Board found that the lockout, implemented in response to the Unions' "inside game" tactics, was not "inherently destructive of employee rights," was justified by legitimate business interests and was not motivated by anti-union animus. Because we conclude the Board's decision is in accord with the law and supported by substantial evidence, we deny the Unions' petitions for review.
 
 I.
 
 2
 In April 1992 CIPS, a public utility which generates and distributes electricity and gas in Illinois, began negotiating with each of the Unions over contracts to succeed those expiring in June 1992. When no agreement was reached by March 1993 CIPS submitted a "final" offer to each of the Unions, which each voted to reject. In lieu of striking, the Unions decided to institute an "inside game" strategy under which their members agreed to refuse to work voluntary over-time and generally to "work-to-rule" (e.g., "adhering strictly to all company safety and other rules; doing exactly and only what they were told; reporting to work precisely on time and parking work trucks at company facilities at day's end (thus precluding employees from responding to after hours emergencies); presenting all grievances as a group; advising non-employees to report unsafe conditions; and advising customers of their right to various company information and of their right to have their meters checked annually for accuracy," CIPS, slip op. at 1, 1998 WL 600788, at *1).The Unions began the inside game strategy on April 24, 1993 and continued to negotiate while carrying it out. At 4:00 a.m. on May 20, 1993 CIPS instituted a lockout of all members of the two locals. Negotiations continued during the lockout and CIPS reached an agreement with Local 148 in June, thereby ending the lockout of its members. Local 148 nonetheless remained off the job in support of Local 702. CIPS ended the lockout of Local 702 on August 25, 1993, although no contract agreement was reached until January 1994.
 
 
 3
 Each of the Unions filed unfair labor practice charges with the NLRB, alleging violations of section 8(a)(1), (3) and (5) of the National Labor Relations Act, 29 U.S.C. 158(a)(1), (3), (5). Following a hearing the ALJ judge issued a decision dated May 20, 1996, which found that CIPS had violated all three cited subsections. In relevant part, the ALJ's decision concluded that the work-to-rule campaign constituted protected activity for which the lockout was intended as punishment in violation of section 8(a)(3). In a 2-1 decision dated August 27, 1998 the Board reversed the ALJ on the section 8(a)(3) lockout charge, concluding the lockout was instituted not out of anti-union animus but with the dual "legitimate and substantial" business justifications of facilitating contract negotiations and of countering the economic effects of the inside game strategy. See CIPS, slip op. at 4-7, 1998 WL 600788, at *6-10.
 
 II.
 
 4
 The Unions challenge both the Board's interpretation of the law and its factual findings. "The courts accord a very high degree of deference to administrative adjudications by the NLRB." United Steelworkers workers of America, 14534 v. NLRB, 983 F.2d 240, 244 (D.C. Cir. 1993). "The Board has primary responsibility for applying the general provisions of the [National Labor Relations Act], and where its interpretation of what the Act requires is reasonable, in light of the purposes of the Act and the controlling precedent of the Supreme Court, courts should respect its policy choices." United Food & Commercial Workers Int'l Union v. NLRB, 880 F.2d 1422, 1428 (D.C. Cir. 1989) (citing Pattern Makers' League of N. Am. v. NLRB, 473 U.S. 95 (1985); Automobile Salesmen's Union Local 1095 v. NLRB, 711 F.2d 383 (D.C. Cir. 1983))."[W]ith respect to questions of fact," "the findings of the Board ... if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. 160(e). "Where the Board has disagreed with the ALJ, as occurred here, the standard of review with respect to the substantiality of the evidence does not change." United Food & Commercial Workers v. NLRB, 768 F.2d 1463, 1469-70 (D.C. Cir. 1985) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 496 (1951); General Teamsters Local Union No. 174 v. NLRB, 723 F.2d 966, 971 (D.C. Cir. 1983)).Nevertheless, "cases have made clear that '[t]he findings and decision of the [ALJ] form an important part of the "record" on which [the] judgment of substantiality is to be based,' International Brotherhood of Teamsters, Local No. 310 v. NLRB, 587 F.2d 1176, 1180 (D.C. Cir. 1978), and that the Board, when it disagrees with the ALJ, 'must make clear the basis of its disagreement ...' General Teamsters, supra, 723 F.2d at 971." Id. at 1470 (alteration in original). In the end, however, "[s]ince the Board is the agency entrusted by Congress with the responsibility for making findings under the statute, 'it is not precluded from reaching a result contrary to that of the [ALJ] when there is substantial evidence in support of each result,' " and " 'is free to substitute its judgment for the [ALJ]'s.' " Carpenters Local 33 v. NLRB, 873 F.2d 316, 319 (D.C. Cir. 1989) (quoting Sign & Pictorial U., Local 1175 v. NLRB, 419 F.2d 726, 734 (D.C. Cir. 1969) (alteration in original)). Because we conclude the Board's decision here was supported by substantial evidence and its disagreement with the ALJ fully explained, we do not disturb it.
 
 
 5
 Section 8(a)(3) of the National Labor Relations Act provides in relevant part: "It shall be an unfair labor practice for an employer ... (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization:...." 29 U.S.C. 158(a)(3). In NLRB v. Great Dane Trailers, 388 U.S. 26 (1967), the United States Supreme Court construed its precedent to establish a comprehensive framework for analyzing allegations of a section 8(a)(3) violation:
 
 
 6
 The statutory language 'discrimination * * * to * * *discourage' means that the finding of a violation normally turns on whether the discriminatory conduct was motivated by an antiunion purpose. American Ship Building Co. v. National Labor Relations Board, 380 U.S. 300,85 S.Ct. 955 (1965). It was upon the motivation element that the Court of Appeals based its decision not to grantenforcement, and it is to that element which we now turn. In three recent opinions we considered employermotivation in the context of asserted 8(a)(3) violations. American Ship Building Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965);and National Labor Relations Board v. Erie ResistorCorp., [373 U.S. 221, 227, 83 S.Ct. 1139, 1144-45, 10L.Ed.2d 308 (1963)]. We noted in Erie Resistor, supra,373 U.S. at 227, 83 S.Ct. at 1144, that proof of an antiunion motivation may make unlawful certain employ-er conduct which would in other circumstances be lawful. Some conduct, however, is so 'inherently destructive of employee interests' that it may be deemed proscribed without need for proof of an underlying improper motive. National Labor Relations Board v. Brown, supra, 380U.S., at 287, 85 S.Ct. at 986, American Ship Building Co.v. National Labor Relations Board, supra, 380 U.S. at311, 85 S.Ct. at 963. That is, some conduct carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.' National Labor Relations Board v. Erie Resistor Corp., supra, at 228, 231, 83 S.Ct.at 1145-1147. If the conduct in question falls within this 'inherently destructive' category, the employer has the burden of explaining away, justifying or characterizing 'his actions as something different than they appear on their face,' and if he fails, 'an unfair labor practice charge is made out.' Id., at 228, 83 S.Ct. at 1145. And even if the employer does come forward with counter explanations for his conduct in this situation, the Board maynevertheless draw an inference of improper motive from the conduct itself and exercise its duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy. Id., at 229, 83 S.Ct. at 1145. On the other hand, when 'the resulting harm to employee rights is * * * comparatively slight, and a substantial and legitimate business end is served, the employers' conduct is prima facie lawful,' and an affirmative showing of improper motivation must be made. National Labor Relations Board v. Brown, supra, 380 U.S. at 289, 85S.Ct. at 987; American Ship Building Co. v. National Labor Relations Board, supra, 380 U.S. at 311-313, 85S.Ct. at 963-964.
 
 
 7
 388 U.S. at 33-34. Applying this framework, the Board found that the CIPS lockout did not violate section 8(a)(3).
 
 
 8
 The Board first concluded that "the lockout in the instant case, standing alone, cannot be considered inherently destructive of employee rights," based on the Supreme Court's holding in American Ship Bldg. that "a lockout for the purpose of applying pressure on a union during a bargaining dispute is not 'one of those acts which are demonstrably so destructive of collective bargaining that the Board need not inquire into employer motivation.' " CIPS, slip op. at 3, 1998 WL 600788, at *4 (quoting American Ship Bldg., 380 U.S. at 309); see also slip op. at 3, 1998 WL 600788, at *4 (noting even in Brown, where employer took "additional step of hiring temporary replacements after the lockout to continue operations," Supreme Court "found that such conduct is not inherently destructive of employee rights"). The Board therefore determined "to treat [the lockout] as having a 'comparatively slight' impact on employee rights and apply the second Great Dane test to determine the lockout's legality." CIPS, slip op. at 4, 1998 WL 600788, at *5. We agree with the Board's analysis. The Supreme Court made it clear in American Ship Bldg., as the Board observed, that a lockout "does not fall into that category of cases arising under 8(a)(3) in which the Board may truncate its inquiry into employer motivation." 380 U.S. at 312.[1] Thus, the Board correctly concluded that under the Great Dane framework the Board must inquire "whether the Respondent possessed a legitimate and substantial business justification for the lockout." CIPS, slip op. at 4, 1998 WL 600788, at *5. The Board reasonably found that CIPS had two such justifications.
 
 
 9
 The first objective the Board attributed to CIPS was "to force the Unions to cease their inside game activities." CIPS, slip op. at 4, 1998 WL 600788, at *5. Noting that the strike that prompted the lockout in Brown was "also an economic bargaining weapon in support of contract demands and no less protected than the inside game that the judge found was protected in this case," the Board concluded that the lockout was a legitimate defense against the Unions' "inside game weapon" deployed as part of "economic warfare in the midst of bargaining negotiations with the hope of securing agreement on their terms for new contracts." CIPS, slip op. at 4, 1998 WL 600788, at *5. Applying the standard of review set forth above, we find the Board's conclusion--that CIPS's defensive use of the lockout here against the Unions' inside game was as justified as the lockout in Brown aimed at the employees' economic strike--to be "reasonable, in light of the purposes of the Act and the controlling precedent of the Supreme Court," United Food, 880 F.2d at 1428. Accordingly, we defer to the Board's policy choice. Id.
 
 
 10
 We also agree that the second business objective the Board identified--"resolution of issues that were dividing the parties in their bargaining negotiations," CIPS, slip op. at 4, 1998 WL 600788, at *6--was a legitimate one and supported by the evidence. The Board found as a fact that in implementing the lockout CIPS "sought resolution of issues that were dividing the parties in their bargaining negotiations," CIPS, slip op. at 4, 1998 WL 600788, at *6, based on the text of letters CIPS's chief executive officer sent the members of each of the Unions on May 20, 1993, the day the lockout began. The bulk of each letter outlined the contract concessions CIPS made in its final offer and the chronology of negotiations, culminating in the inside game. In addition, the letter to Local 702 members stressed that union negotiators had continually rejected CIPS's urging to place its offers before the membership and was accompanied by an analysis of the differences between the previous contract and CIPS's final offer of a new one.[2] The letters to Local 148 explained the Company's position on the one apparent sticking point in negotiations (the transfer of six union positions to management). Each letter closed with the following language:
 
 
 11
 Like you, I am anxious to bring these issues to a successful conclusion and have you back at your jobs at the earliest possible date. I sincerely regret the disruption this decision will bring into your lives. My hope is that this aspect of our labor dispute is short-lived.
 
 
 12
 App. 632-33, 644-48. Given their focus and tenor (concentrating on the course and substance of negotiations and CIPS's eagerness to resolve the contract dispute), we conclude the letters constitute substantial evidence in support of the Board's finding "that a purpose of the lockout was to affect the outcome of negotiations between the Respondent and the Unions." CIPS, slip op. at 5, 1998 WL 600788, at *7.We therefore uphold the Board's consequent determination "that application of economic pressure in support of this bargaining position constitutes a legitimate and substantial business justification for the lockout within the meaning of Great Dane." CIPS, slip op. at 5, 1998 WL 600788, at *7.
 
 
 13
 Finally, having found two substantial and legitimate business objectives, the Board undertook the third inquiry of the Great Dane framework: asking whether the Unions had made an "affirmative showing of improper motivation," such as through "evidence indicating that the lockout was intended to 'discourage union membership' or that was [sic] used 'in the service of designs inimical to the process of collective bargaining.' " CIPS, slip op. at 6, 1998 WL 600788, at *9 (quoting American Ship Bldg., 380 U.S. at 308, 312-313). The Board reasonably found "that 'not only is there absent in [sic] the record any independent evidence of improper motive, but the record contains positive evidence of the [Respondent's] good faith.' " CIPS, slip op. at 7, 1998 WL 600788, at *10 (quoting Brown, 380 U.S. at 290). As examples of such evidence, the Board pointed to CIPS's long and stable bargaining relationship with the Unions and its lengthy, good faith attempts to reach a contract here, including its clearly expressed desire in the May 20, 1993 letter to resolve differences and resume business as usual as soon as possible. We conclude the Board's historic and continuing good faith dealing with the Union, combined with the absence of affirmative evidence showing anti-union animus, sufficiently supports the Board's finding here.
 
 
 14
 Despite the Board's faithful adherence to Great Dane and its predecessors and specific factual findings, the Unions challenge the Board's decision on two grounds: (1) precedent precludes the Board's finding that CIPS's use of the lockout as an economic defense to the Unions' economic inside game weapon was in furtherance of a permissible business interest and (2) the finding of no anti-union animus on CIPS's part is belied by the record. We find neither argument a basis for overturning the Board's determination.
 
 
 15
 First, the Unions contend the Board's acceptance of the economic defense justification is contrary to Supreme Court precedent which, the Unions maintain, requires finding the lockout unlawful because it was intended to curtail "protected" activity, namely the inside game tactics. As the Board correctly observed, however, that activity may be protected does not insulate it from counteraction by an employer. CIPS, slip op. at 4, 1998 WL 600788, at *5 (noting: "To hold that it is not a legitimate business justification for the Respondent to defend against this weapon with a lockout in order to force the Unions to yield, ignores the Court's observation in American Ship that the 'right to bargain collectively does not entail any "right" to insist on one's position free from economic disadvantage.' ") (quoting 380 U.S. at 309); see Machinists v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 152-53 (1976) ("[E]ven were the activity presented in the instant case 'protected' activity within the meaning of 7, economic weapons were available to counter the Union's refusal to work overtime, e.g., a lockout....") (citing American Ship Bldg.) (footnote omitted). The strikes in both American Ship Bldg. and Brown, as the Board noted, were also protected activities--yet the employers' responsive lockouts in those cases were upheld by the Supreme Court. We see no reason to treat differently the lockout here which was implemented in response to the inside game strategy that the Unions adopted as an alternative to a strike.
 
 
 16
 We also believe the Board's endorsement of the economic defense justification is, contrary to the Unions' insistence, consistent with its own precedent. The Unions rely most heavily here on the Board's decisions in Riverside Cement Co., 296 N.L.R.B. 840 (1989), Thrift Drug Co, 204 N.L.R.B. 41 (1973), and Carlson Roofing, 245 N.L.R.B. 13 (1979). The Board reasonably distinguished Riverside on the ground that the action taken there was not in furtherance of "lawful bargaining" but was an attempt to implement "a unilateral change in the employees' contractual terms of employment" by requiring employees to furnish specific personal tools which, under their collective bargaining agreement, they were expressly exempted from furnishing. CIPS, slip op. at 6-7 n.20, 1998 WL 600788, at *15 n.20. Any worker who did not provide his own tools was locked out. In finding a section 8(a)(3) violation, the Riverside Board stressed that the "denial of work was limited to only those employees who engaged in action they were entitled to take under the contract" and therefore "was not a lawful lockout," which is "generally permissible in anticipation of a strike or in support of an employer's legitimate bargaining position." 296 N.L.R.B. at 841. Similarly, in Thrift Drug Co., the Board found a section 8(a)(3) violation where the employer suspended a single picketing employee solely on the ground the employee "was unlawfully selected for suspension because of her activities on behalf of the Union." 204 N.L.R.B. at 41. In contrast to Riverside and Thrift Drug, the lockout here was directed unit-wide, not to specific employees engaged in specific acts. Finally, Carlson Roofing is inapposite because the Board's finding that the lockout there violated section 8(a)(3) was overturned on review by the Seventh Circuit. See Carlson Roofing Co. v. NLRB, 627 F.2d 77, 82 (7th Cir. 1980).
 
 
 17
 The Unions also argue that the Board ignored the ALJ's credibility determinations and findings regarding the true motive behind the lockout. The Board, however, expressly accepted the ALJ's finding that the lockout was implemented "in reprisal" for the inside game, ALJ Decision at 22, 1998 WL 600788, at *35, CIPS, slip op. at 2, 1998 WL 600788, at *2, but then found the motive was "not ... impermissible," CIPS, slip op. at 4, 1998 WL 600788, at *5. The ALJ based his motive finding on statements by company management that it would have "preferred" and been "better off with" a strike or lockout than with the inside game strategy, under which unit employees "were getting the best of both worlds" by "putting pressure on the Company while still getting their paycheck for the daytime work." ALJ Dec. at 65 [App. 848].Neither this testimony nor the finding itself is at odds with the Board's finding that CIPS implemented the lockout as an economic response to the inside game, which CIPS viewed as economically injurious. The Board's principal factual dispute with the ALJ was on how to construe the text of the May 20, 1993 letters and the Board decision sufficiently explains its differing, and we believe more defensible, interpretation of the letters' language. See Mathews Readymix, Inc. v. NLRB, 165 F.3d 74, 77 (D.C. Cir. 1999) ("Board's findings of fact are conclusive if supported by substantial evidence," provided it "make clear the basis of its disagreement" when reversing ALJ) (citing Avecor, Inc. v. NLRB, 931 F.2d 924, 928 (D.C. Cir. 1991); United Food & Commercial Workers Int'l Union, Local 152 v. NLRB, 768 F.2d 1463, 1470 (D.C. Cir. 1985)).
 
 
 18
 Finally, Local 128 challenges the Board's finding that its members were locked out in order to obtain a contract on the ground that agreement on a contract with Local 128 (as distinct from Local 702) was imminent. We accept the Board's finding as supported by the facts. The record establishes that Local 128 acted in unison with Local 207 in planning and implementing the inside game and that, even after CIPS terminated the lockout of Local 128, its members stayed away from work in support of Local 702 (as they might well have done ab initio if CIPS had not locked them out). It was therefore not unreasonable for CIPS and the Board to treat the two locals as a single bargaining force. In fact, given the unified actions of the two locals, lockout of only one might well have suggested unlawful discrimination under the Board's decisions in Riverside and Thrift Drug. See supra p. 19.
 
 
 19
 For the preceding reasons, the Unions' petitions for review are
 
 
 20
 Denied.
 
 
 
 Notes:
 
 
 [1]
 Local 702 contends the Board was required to "analyz[e] the specific facts in this case," in order to make the "inherently destructive" determination. See Local 702 Brief at 39-44. The Supreme Court decisions indicate, however, that an across-the board lockout "as a means to bring economic pressure to bear in support of the employer's bargaining position," 380 U.S. at 308, is categorically not "inherently destructive." See American Ship Bldg., 380 U.S. at 310-12 ("Nor is the lockout one of those acts which are demonstrably so destructive of collective bargaining that the Board need not inquire into employer motivation, as might be the case, for example, if an employer permanently discharged his unionized staff and replaced them with employees known to be possessed of a violent antiunion animus.... This is not to deny that there are some practices which are inherently so prejudicial to union interests and so devoid of significant economic justification that no specific evidence of intent to discourage union membership or other antiunion animus is required. In some cases, it may be that the employer's conduct carries with it an inference of unlawful intention so compelling that it is justifiable to disbelieve the employer's protestations of innocent purpose.... But this lockout does not fall into that category of cases arising under 8(a)(3) in which the Board may truncate its inquiry into employer motivation.");Brown, 380 U.S. at 284. ("[W]e do not see how the continued operations of respondents and their use of temporary replacements imply hostile motivation any more than the lockout itself; nor do we see how they are inherently more destructive of employee rights.").Thus, the "specific facts" come into play only in the subsequent inquiries whether the particular lockout has a legitimate business justification and whether it was motivated by anti-union animus.
 
 
 [2]
 According to the ALJ, a similar analysis was included with the letters to Local 148 members, CIPS, ALJ Dec. 23 [App. 806], but it does not appear in the appendix filed with the court.