# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 20, 2012          Decided May 28, 2013

No. 11-1314

TENNECO AUTOMOTIVE, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

LOCAL 660, INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA, UAW,
INTERVENOR

———

Consolidated with 11-1353

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Gregory J. Utken* argued the cause for petitioner. With
him on the briefs was *Brian R. Garrison*.

*Glenn M. Taubman* was on the brief for *amicus curiae* Lonnie Tremain in support of petitioner.

*Greg P. Lauro*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Jill A. Griffin*, Supervisory Attorney, and *Jeffrey Burritt*, Attorney.

*Stephen A. Yokich* argued the cause and filed the brief for intervenor. *Barbara J. Hillman* entered an appearance.

Before: ROGERS and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case arises from a protracted labor dispute between Tenneco Automotive, Inc. ("Tenneco" or "Company") and Local 660, International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, UAW ("Union"). Tenneco designs, manufactures, and sells automotive products. From 1945 until December 4, 2006, Tenneco recognized the Union as the exclusive bargaining agent for a unit of production and maintenance employees at the Company's Grass Lake, Michigan facility. In 2004, Union and Company representatives pursued negotiations in an effort to reach a new collective bargaining agreement to replace the one that expired on May 12, 2004. Negotiations failed, however, and the Union called a strike on April 26, 2005. Tenneco continued operations by hiring permanent replacements, using employees who decided not to participate in the strike, and contracting out work to another employer.

Relations between the parties soured during the strike and a number of incidents arose that brought the parties before the

National Labor Relations Board ("NLRB" or "Board"). The Union filed unfair labor practice charges with the Board on February 1 and 15, 2006. On February 10, 2006, some bargaining unit employees filed a decertification petition with the Board. That petition was held in abeyance pending resolution of the Union's unfair labor practice charges. However, on December 4, 2006, a substantial majority of the unit employees presented another petition for decertification to the Company. Based on this second decertification petition, Tenneco gave notice that it would no longer recognize the Union as the employees' bargaining agent.

In the matter before the Board, the NLRB's General Counsel sought to prove that Tenneco had committed multiple violations of Section 8 of the National Labor Relations Act ("Act"), 29 U.S.C. § 158, including, *inter alia*: Section 8(a)(1) for directing employees not to say or do anything that could "evoke a response" from other employees; Sections 8(a)(1) and (3) for disciplining employee Joseph Helton because of his pro-Union Activities; and Sections 8(a)(1) and (5) for refusing to provide the Union with information regarding the possible installation of video cameras in the workplace, unilaterally promulgating a rule requiring supervisory approval prior to the posting of signs, letters, or printed material at the Company's facility, and withdrawing recognition of the Union. The Administrative Law Judge ("ALJ") found that some of Tenneco's challenged conduct violated the Act, but rejected many of the claims advanced by the NLRB's General Counsel. *See Tenneco Auto., Inc.*, 2008 WL 1786082 (Apr. 16, 2008). Most significantly, the ALJ concluded the employees' disaffection with the Union was not attributable to Tenneco's unfair labor practices and, therefore, the Company's withdrawal of recognition was lawful as of December 4, 2006. *Id.* (citing *Master Slack Corp.*, 271 N.L.R.B. 78 (1984)). The General Counsel and the Union filed exceptions to the ALJ's findings, and the Board ruled for

the Union on all unfair labor practice charges. With regard to the withdrawal of recognition, the Board held "that certain of the[] unfair labor practices tainted the [employees'] petition [for decertification], and that the withdrawal of recognition was therefore unlawful." *Tenneco Auto., Inc.*, 357 N.L.R.B. No. 84, 2011 WL 4590190, at *9 (Aug. 26, 2011). Tenneco now petitions this court for review, and the Board cross-petitions for enforcement of its order.

We grant Tenneco's petition for review with respect to the charge relating to the Company's withdrawal of recognition. On the record before the court, there is no substantial evidence that the Company's unfair labor practices "significantly contribute[d]" to the employees' petition for decertification. *See Williams Enters., Inc. v. NLRB*, 956 F.2d 1226, 1234 (D.C. Cir. 1992). However, with respect to the remaining disputed unfair labor practice charges, we grant the Board's cross-application for enforcement. Although the Company has raised vigorous challenges to the Board's holdings, we find substantial evidence to support the Board's determinations that Tenneco's conduct violated Sections 8(a)(1), (3), and (5) of the Act. *See Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) ("[T]he Board is to be reversed only when the record is so compelling that no reasonable factfinder could fail to find to the contrary.").

## I. Background

### A. Facts

Tenneco has a prototype engineering facility at Grass Lake, Michigan, where the Union represented between thirty and forty employees. On April 26, 2005, following failed collective bargaining negotiations, the Union commenced an economic strike. Some employees resigned from the Union and chose not to strike. The Union excused one unit employee, Joseph Helton, and allowed him to continue

working during the strike. Ten employees resigned from the Union and crossed the picket line during the strike. As the strike continued, Tenneco hired sixteen permanent replacements for strikers.

On August 29, 2005, Union Representative James Walker was informed that Tenneco planned to install video cameras in its test lab due to alleged incidents of tampering with Company property. The Union contended that installation of video devices in the workplace is a mandatory subject of bargaining and requested documentation of the alleged tampering so that it could bargain effectively. Tenneco never responded and ultimately decided against the installation of video cameras.

On January 19, 2006, while the strike was still ongoing, Helton wore a tee shirt to work displaying the slogan, "Thou Shall Not Scab." Company Supervisor Dan Eggleston told Helton to change his shirt because, he believed, some employees would not like the message. Instead, Helton covered the word "scab" with a piece of tape on which he had written the word "steal," so that the slogan read, "Thou Shall Not Steal." Eggleston objected to this message and told Helton to tape over the word "steal." Helton taped over "steal" and wrote the words "be a low life" on the new piece of tape. Eggleston again objected, and ordered Helton to tape over the slogan and leave it blank. After further discussion, Helton and Eggleston agreed that Helton should go home for the day. The next day, Helton received a written reprimand for wearing the "scab" slogan on his shirt and then altering the message to "goad fellow employees inappropriately and unnecessarily." Br. for NLRB at 9.

On January 27, 2006, Walker requested information about the persons hired as striker replacements, including their home addresses. Tenneco declined to provide the addresses because of concerns that the Union might use the

information to harass or intimidate the replacement workers at their homes. Tenneco sent a letter reminding the Union that it already had multiple means of communicating directly with replacements by posting notices on the Union bulletin board and by having the Union President, Vice President, and Steward (all of whom were working in the Company facility) interact with the replacements before and after working hours and during breaks. The Union later explained that, because the replacements were permanent employees and thus members of the unit, it needed the contact information to be able to communicate with these employees about working conditions, collective bargaining proposals, grievances, and other representational matters. Walker claimed that "mailing addresses are the only practical way for the Union to communicate with these bargaining unit members in a private fashion that cannot be monitored by Tenneco." Br. for NLRB at 10.

On January 27, 2006, after ten months of striking, the Union made an unconditional offer to have the striking employees return to work. The first four strikers returned on February 6, 2006, and Company Manager, Mark Kortz, held a meeting with all employees at the start of the shift. The work force then consisted of permanent striker replacements, returning strikers, and employees who had previously abandoned the strike. During his presentation, Kortz instructed the employees to refrain from inciting tensions. He amplified by saying that employees should "not . . . engage in taunting, verbal or physical threats, or in other conduct that is confrontational or meant to evoke a response from a co-worker." *Tenneco Auto., Inc.*, 2011 WL 4590190, at *7. Kortz also instructed employees not to post items in their work areas without approval. He made no reference to postings on bulletin boards. Following the February 6, 2006 meeting, Union officers posted items on bulletin boards, including notices of Union meetings, and employees also continued to

post items on the employee bulletin board. Union officers also communicated directly with the striker replacements without interference.

On December 4, 2006, an employee presented Tenneco with a petition signed by seventy-seven percent of the employees (twenty-four out of the thirty-one bargaining unit employees) asking Tenneco to withdraw recognition from the Union. After verifying the signatures on the petition, Tenneco notified the Union that it had received the petition and that it was withdrawing recognition of the Union.

## B.  Proceedings Below

After the Union filed unfair labor practice charges, the Board's Regional Director issued a consolidated complaint against Tenneco on July 31, 2007. The complaint alleged that Tenneco, throughout the course of the strike and upon its withdrawal of Union recognition, had committed multiple violations of Sections 8(a)(1), (3), and (5) of the Act. 29 U.S.C. § 158(a)(1), (3), (5).

In October, 2007, a three-day hearing was held before an ALJ. The ALJ found that Tenneco's denial of the Union's request for the replacement workers' home addresses was permissible; that the discipline of Helton over the tee shirt incident did not constitute an unfair labor practice; that Kortz's instruction not to "evoke a response" was reasonable; that Kortz did not create a new posting rule without first consulting with the Union; and that, while Tenneco's denial of the Union's request for information about the installation of security cameras violated the Act, "under the circumstances," the violation was "very close to de minimus [sic]," because the cameras were never installed. *Tenneco Auto., Inc.*, 2008 WL 1786082. The ALJ credited several other allegations of unfair labor practices that were not discussed by the Board and are not before this court. Most

significantly, the ALJ concluded that Tenneco's withdrawal of Union recognition on December 4, 2006, was lawful. The ALJ predicated his decision on an application of "the *Master Slack* analytical framework [for] determining whether there is [a] causal relationship between the unfair labor practices and the employees' disaffection with the Union." *Id.* (relying on *Master Slack*, 271 N.L.R.B. at 84). In the ALJ's view, such a causal relationship was lacking.

On August 26, 2011, the Board rejected most of the ALJ's proposed findings. The Board agreed with the ALJ that Tenneco's failure to respond to the Union's request for information about the proposed installation of a security camera was an unfair labor practice; however, the Board rejected the ALJ's characterization of that violation as *de minimis* because the request was still relevant at the time it was made. *Tenneco Auto., Inc.*, 2011 WL 4590190, at *2. The Board found that Tenneco's failure to provide the replacement workers' home addresses violated the Act because there was no "clear and present danger" that the Union would misuse the information. *Id.* at *3-4. The Board also found that Tenneco's discipline of Helton for the tee shirt incident violated the Act because "Helton's protected conduct was a motivating factor in the Respondent's decision to issue the discipline, and . . . the evidence fails to show that the Respondent would have disciplined Helton in the absence of his protected activity." *Id.* at *4-6.

The Board also held that Kortz's direction to employees not to say or do anything that could "evoke a response" constituted another violation of the Act. The majority opinion for the Board noted:

> The dissent suggests that the only reasonable interpretation of Kortz's statement is as a directive against threatening conduct not protected by the Act. In so doing, however, it ignores the fact that the statement

was made in the context of Kortz describing the work force in terms of strike status—those who crossed the picket line, permanent replacements, and reinstated strikers. Given this context, and absent any reference to unprotected employee conduct, it is simply not reasonable to conclude that employees would narrowly interpret the statement to exclude all Section 7 activity.

*Id.* at \*8 (referring to 29 U.S.C. § 157, which protects the right of employees "to engage in other concerted activities for the purpose of collective bargaining"). The Board further held that Kortz's announcement about the posting of signs in the workplace violated the Act because Tenneco's "longstanding practice allowed employees to freely post materials without obtaining prior approval," and thus "Kortz's announcement declared a substantial change to this past practice." *Id.* at \*8.

In light of these findings, the Board concluded that Tenneco improperly withdrew recognition of the Union. The Board rejected the ALJ's application of *Master Slack* and concluded "that certain of the[] unfair labor practices [committed by Tenneco] tainted the petition" for decertification. *Id.* at 9. Because the Board found that the employer's illegal conduct was responsible for the employees' disaffection with the Union, it held that the withdrawal was unlawful. *Id.* at 9-10.

Tenneco now petitions this court for review of the Board's decision and the NLRB and the Union have cross-applied for enforcement.

## II. Analysis

### A. Standard of Review

"As we have noted many times before, our role in reviewing an NLRB decision is limited. We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011). We owe "substantial deference" to inferences drawn by the Board from the factual record. *Halle Enters., Inc. v. NLRB*, 247 F.3d 268, 271 (D.C. Cir. 2001). "When the Board concludes that a violation of the [Act] has occurred, we must uphold that finding unless it has no rational basis or is unsupported by substantial evidence. It is not necessary that we agree that the Board reached the best outcome in order to sustain its decisions. The Board's findings of fact are conclusive when supported by substantial evidence on the record considered as a whole." *Bally's Park Place*, 646 F.3d at 935 (citations and quotations omitted).

Furthermore, substantial evidence review does not change when the Board disagrees with the ALJ. *Local 702, IBEW v. NLRB*, 215 F.3d 11, 15 (D.C. Cir. 2000). In such situations, the Supreme Court has instructed that an ALJ's findings should not be given "more weight than in reason and in the light of judicial experience they deserve." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951). This means "that evidence supporting a conclusion may be less substantial when an impartial, experienced [ALJ] who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when [the ALJ and the agency have] reached the same conclusion." *Id.* However, an ALJ's findings "are to be considered along with the consistency and inherent probability of testimony," and

the significance of the findings will depend "largely on the importance of credibility in the particular case." *Id*. When the Board and ALJ disagree, the Board's obligation is to "make clear the basis of its disagreement." *Local 702, IBEW*, 215 F.3d at 15. "[S]ince the Board is the agency entrusted by Congress with the responsibility for making findings under the statute, it is not precluded from reaching a result contrary to that of the [ALJ] when there is substantial evidence in support of each result, and is free to substitute its judgment for the [ALJ]'s." *Id.*

The obligation of the reviewing court is to assess the "whole record," meaning that our analysis must consider not only the evidence supporting the Board's decision but also "whatever in the record fairly detracts from its weight." *Universal Camera Corp.*, 340 U.S. at 488; *see also CitiSteel USA, Inc. v. NLRB*, 53 F.3d 350, 354 (D.C. Cir. 1995). A reviewing court must "ask whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999).

## B.  Insubstantial Challenges Raised by the Company

As noted above, the parties' dispute has narrowed to six contested issues. Those issues are whether the Company committed unfair labor practices when (1) it disciplined employee Joseph Helton because of his pro-Union activities; (2) refused to provide the Union with the home addresses of the striker-replacement employees; (3) refused to provide the Union with information regarding the planned installation of video cameras in the workplace; (4) directed employees not to say or do anything that could "evoke a response" from other employees; (5) unilaterally promulgated a rule requiring supervisory approval prior to the posting of material at the Company's facility; and (6) withdrew recognition of the Union. We grant the Board's cross-petition for enforcement as to the first five charges. The Board's decision on these

matters speaks for itself and needs no amplification by the court. *See W.C. McQuaide, Inc. v. NLRB*, 133 F.3d 47, 49 (D.C. Cir. 1998) (noting that there is no reason for the court to address certain disputed matters when "the company's . . . challenges are met by sufficient evidence in the record to support the Board's findings").

After careful review of the record and the parties' arguments, we uphold the Board's findings that:

> [Tenneco] violated Section 8(a)(1) of the Act by directing employees to refrain from saying anything to each other that might be deemed offensive or evoke a response from another employee. [Tenneco] violated Section 8(a)(3) and (1) of the Act by issuing a written warning to employee Joseph Helton because of his support for and activities on behalf of the Union. [Tenneco] violated Section 8(a)(5) and (1) of the Act by (a) Failing and refusing to furnish the Union with requested information regarding the planned installation of video cameras . . . . (c) Failing and refusing to furnish the Union with requested information concerning the home addresses of the . . . permanent replacement employees. . . . (e) Promulgating a rule requiring supervisory approval prior to the posting of signs, letters, or printed material . . . .

*Tenneco Auto., Inc.*, 2011 WL 4590190, at *11. These findings are supported by substantial evidence and are consistent with established precedent.

We now turn to the Board's finding that Tenneco committed an unfair labor practice when it withdrew recognition of the Union. Because, for the reasons indicated below, we find no substantial evidence to support this charge, we grant the Company's petition for review.

### C. Tenneco's Withdrawal of Union Recognition

When an employer has objective evidence that a union has lost majority support, such as "a petition signed by a majority of the employees in the bargaining unit," it may unilaterally withdraw recognition. *Highlands Hosp. Corp. v. NLRB*, 508 F.3d 28, 31 (D.C. Cir. 2007) (quoting *Levitz Furniture Co. of the Pac.*, 333 N.L.R.B. 717, 725 (2001)). But an employer may not rely on an employee petition "when the employer's unfair labor practices significantly contribute to the loss of majority status by undercutting the employees' support of the union." *Williams Enters.*, 956 F.2d at 1234.

The Board has explained that "not every unfair labor practice will taint evidence of a union's subsequent loss of majority support." *Lexus of Concord, Inc.*, 343 N.L.R.B. 851, 852 (2004). Thus, the Board has the burden of adducing substantial evidence to support its finding that an employer's unfair labor practices have "significantly contributed" to the erosion of a union's majority support. *See Quazite Div. of Morrison Molded Fiberglass Co. v. NLRB*, 87 F.3d 493, 496 (D.C. Cir. 1996). In *Master Slack*, the Board set out a four-factor test to determine whether "the unfair labor practices . . . have caused the employee disaffection [with the Union] or at least had a meaningful impact in bringing about that disaffection." 271 N.L.R.B. at 84. The Board's four-factor test, which we have endorsed, includes consideration of:

> (1) The length of time between the unfair labor practices and the employee petition; (2) the nature of the unfair labor practices, including whether they are of a nature that would cause a detrimental or lasting effect on the employees; (3) the tendency of the unfair labor practices to cause employee disaffection with the union; and (4) the effect of the unlawful conduct on the employees' morale, organizational activities, and membership in the union.

14

*Williams Enters.*, 956 F.2d at 1236 (citing *Master Slack*, 271 N.L.R.B. at 84)).

Both the ALJ and the Board applied the *Master Slack* factors and arrived at opposite conclusions. However, the Board's judgment is infirm because it disregards material evidence that belies any causal relationship between the Company's unfair labor practices and the employees' petition for decertification. Recognizing that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight," *Universal Camera Corp.*, 340 U.S. at 488, we conclude that on the record before us the Board's determination is not supported by substantial evidence.

First, it is highly significant that ten months passed between the last credited unfair labor practice and the submission of the employees' petition for decertification. "The length of time between the unfair labor practices and the withdrawal of recognition" is the first of the four *Master Slack* factors, 271 N.L.R.B. at 84, and it is obviously an important consideration. This temporal factor typically is counted as weighty only when it involves a matter of days or weeks. *See, e.g.*, *Bunting Bearings Corp.*, 349 N.L.R.B. 1070, 1072 (2007) (eight to fifteen days was "close temporal proximity"); *Miller Waste Mills, Inc.*, 334 N.L.R.B. 466, 468 (2001) ("close temporal proximity" when unfair labor practices occurred two to six weeks before petition for withdrawal). However, a lapse of months fails to support, and typically weighs against, a finding of close temporal proximity. *See, e.g.*, *Garden Ridge Mgmt., Inc.*, 347 N.L.R.B. 131, 134 (2006) (five-month delay weighed against finding that unfair labor practices caused employee sentiment against Union); *Lexus of Concord, Inc.*, 343 N.L.R.B. at 852 (no temporal proximity when lapse was three months). Here, even the NLRB admitted in its decision that ten months is "a relatively long period." *Tenneco Automotive, Inc.*, 2011 WL

4590190, at \*10. The Board maintained, however, that "the nature of some of the violations would tend to have a lasting detrimental effect on the employees' view of the Union," particularly Tenneco's refusal to provide the addresses of the replacement workers. *Id.* In the Board's view, this and other unfair labor practices "depriv[ed] the Union of opportunities to meaningfully address any lingering feelings of disconnect that would naturally exist in the aftermath of a contentious and divisive strike." *Id.* But for reasons explained below, the cited conduct did not constitute the type of unfair labor practices that the Board has historically characterized as "detrimental or lasting."

The second *Master Slack* factor is "the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees." 271 N.L.R.B. at 84. The third factor is "any possible tendency to cause employee disaffection from the union." *Id.* These factors obviously are related because unfair labor practices that have a lasting effects on employees are likely to be serious enough to cause disaffection with a union. The NLRB relied on four alleged unfair labor practices to show these adverse consequences: Tenneco's refusal to provide the Union with the addresses of replacement employees; Kortz's admonition to employees to avoid having discussions that could "evoke a response"; the requirement that employees obtain supervisor permission before posting materials in the Company facility; and Tenneco's discipline of union advocate Helton. *See Tenneco Auto., Inc.*, 2011 WL 4590190, at \*9-10. No violation of the Act is insignificant; but these violations were hardly "hallmark violations that were highly coercive and likely to remain in the memories of employees for a long time." *Goya Foods of Fla.*, 347 N.L.R.B. 1118, 1121 (2006).

The Board has consistently held that the types of violations that have detrimental and lasting effects are those

involving coercive conduct such as discharge, withholding benefits, and threats to shutdown the company operation. *See, e.g.*, *id.* at 1121-22 (discharging three union adherents and suspending another were "hallmark violations"); *JLL Rest., Inc.*, 347 N.L.R.B. 192, 193 (2006) (threatening employees with closure and job loss); *Beverly Health and Rehab. Serv., Inc.*, 346 N.L.R.B. 1319, 1328-29 (2006) (discharging active union supporter and unilaterally changing hours and vacation); *Overnite Transp. Co.*, 333 N.L.R.B. 1392, 1394 (2001) (hallmark violations included "the granting of an unprecedented wage increase, as well as threats that employees would lose their jobs and that the Employer would close if the employees selected the Union"). The unfair labor practices alleged in this case do not rise to these levels.

This court has agreed with the Board that "the unilateral implementation of changes in working conditions has the tendency to undermine confidence in the employees' chosen collective-bargaining agent." *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 738 (D.C. Cir. 2000). However, to be considered "hallmark violations," such unilateral changes must normally involve the "issues that lead employees to seek union representation," particularly employee earnings. *Goya Foods*, 347 N.L.R.B. at 1122; *see also M & M Auto. Grp., Inc.*, 342 N.L.R.B. 1244, 1247 (2004) (taint found where the employer's "unilateral changes involved the important, bread-and-butter issues of wage increases and promotions for which employees seek and gain union representation"). Considered against this standard, the unilateral changes in workplace policy cited by the Board – a new rule regarding the posting of materials in the workplace and an admonition to avoid having hostile discussions that could "evoke a response" from other employees – did not risk having a "detrimental or lasting effect on employees." *Master Slack*, 271 N.L.R.B. at 84. Indeed, the record makes it clear that both employees and Union officials continued to post notices on bulletin boards

without first obtaining permission from the Company; and Union officials freely talked with unit employees about work conditions and Union activities without interference from the Company.

Nor did the discipline of Helton rise to the level of "detrimental or lasting." Helton received only a mild reprimand in the form of written counseling. And this was the only disciplinary action recorded prior to the Company's withdrawal of Union recognition. *See Tenneco Auto., Inc.*, 2008 WL 1786082.

Likewise, there is no substantial evidence that Tenneco's failure to supply the replacements' home addresses had detrimental effects of the sort that the Board has described in cases involving "hallmark violations." Union officials worked in the Company facility, the bargaining unit was relatively small, and Union officials had routine and easy access to all unit employees. This access did not excuse the Company's failure to provide the Union with the addresses of the striker replacements, but there is nothing in the record to indicate that the Company's failure resulted in "detrimental or lasting" effects sufficient to cause a large majority of the employees to sign a decertification petition.

The Board also failed to establish by substantial evidence that the alleged unfair labor practices in this case actually prevented communications between the employees and the Union. Thus, the Board fails to satisfy the fourth *Master Slack* factor by articulating what, if any, effect "the unlawful conduct [had] on employees morale, organizational activities, and membership in the union." 271 N.L.R.B. at 84. The Board claims that the alleged unfair labor practices were particularly problematic because they "illustrate[] the [Company's] hostility toward the free expression of employee views about union matters, and show[] a determination to prevent the occurrence of protected prounion speech in its workplace."

*Tenneco Auto., Inc.*, 2011 WL 4590190, at \*10. But the evidence does not support this claim. The Union introduced testimony that "the Company's new rules effectively stifled both the Union's and the employees' ability to discuss union related matters." *Tenneco Auto., Inc.*, 2008 WL 1786082. However, the ALJ discredited this testimony and found as a factual matter that between the bulletin board and direct conversations, "the Union had ample opportunity to present to the replacements its side of the strike, the need for union representation, and the progress of the negotiations that were ongoing." *Id.* Indeed, the ALJ found that "the returning strikers could and did speak amicably and about union matters with some of the replacement workers while at work." *Id.* The Board never rejected the ALJ's credibility determinations regarding this testimony.

We do not hold that "hallmark violations" are always necessary to satisfy *Master Slack*. Nor do we mean to hold that an employer's interference with communications between a union and unit employees cannot have a detrimental or lasting effect on employees. Rather, we simply hold that, on this record, there is no substantial evidence to support the Board's finding of a causal relationship between the Company's unfair labor practices and the employees' petition for decertification.

In addition, the Board's assessment of the facts leading up to the withdrawal petition is self-contradictory. At one point in its opinion, the Board asserts that the Company's conduct "significantly interfered with protected speech among its employees." *Tenneco Auto., Inc.*, 2011 WL 4590190, at \*10. Yet, elsewhere the Board explained that "the record reveals that at least some replacement employees were on friendly terms with the union officials who were reinstated after the strike." *Id.* at 3. Given the small size of the company facility (which facilitated communications between the Union

and unit employees) and the failure of the Board to address the ALJ's finding that the employees had ample opportunity to communicate with and about the Union, the Board has not met its burden under the substantial evidence standard to prove a causal connection.

Finally, it is noteworthy that the ALJ heard and credited testimony from nine of the petition-signing employees that "the Company had done nothing to influence their decision." *Tenneco Auto., Inc.*, 2008 WL 1786082. We understand that such testimony is not necessarily dispositive because it may be nothing more than the product of employer intimidation. Nevertheless, such testimony must be assessed on a case-by-case basis, especially when an ALJ has made credibility findings. *See Universal Camera Corp.*, 340 U.S. at 496 ("The significance of [the ALJ's] report, of course, depends largely on the importance of credibility in the particular case."). The Board is free to reject the ALJ's determinations, but it must "make clear the basis of its disagreement." *Local 702, IBEW*, 215 F.3d at 15. After listening to the employees' testimony, the ALJ found that

> the General Counsel did not establish that the [petition] signers' disaffection with the Union was attributable to the [unfair labor practice] allegations that had been pending for over a year. In point of fact, it would be my finding and conclusion that the [unfair labor practices] in this case had essentially nothing to do with the signers' decision to petition for withdrawal of recognition of the Union. . . . [A]s I observed and heard them, [the employees'] morale as such was elevated based on their decision to disassociate from the Union.

*Tenneco Auto., Inc.*, 2008 WL 1786082. The Board, in turn, simply ignored the signing employees' testimony without any explanation. Because the Board never explained any basis for disagreement with the ALJ's findings, we have taken the

findings into account in assessing whether there is substantial evidence to support the Board's judgment.

The foregoing considerations, in combination, forcefully contradict the Board's errant conclusion – based on a shortsighted assessment of the evidence – that Tenneco violated the Act when it withdrew recognition of the Union. Considering the whole record, we think it apparent that substantial evidence does not support the Board's finding that Tenneco's conduct tainted the decision of the employees' to sign a petition for decertification.

## D. The Board's Affirmative Bargaining Order

The Board ordered Tenneco to, *inter alia*, "recognize and, on request, bargain with the Union as the exclusive collective-bargaining representative of the employees in the bargaining unit." *Tenneco Auto., Inc.*, 2011 WL 4590190, at *12. The Board determined "that an affirmative bargaining order is warranted in this case as a remedy for the [Company's] unlawful withdrawal of recognition." *Id.* Before this court, the Board argues that "Tenneco failed to challenge this bargaining order before the Board, and therefore the Court lacks jurisdiction to consider Tenneco's challenge to the remedy now." Br. for NLRB at 58 (citing Section 10(e) of the Act, 29 U.S.C. § 160(e)). We disagree.

Before the Board, Tenneco clearly opposed the unfair labor practice charge based on its alleged withdrawal of recognition. And the Company preserved this challenge in its petition for review in this court. The Board's decision makes it clear that the *sole* basis for the Board's bargaining order is Tenneco's alleged "unlawful withdrawal of recognition." Because we have found that no substantial evidence supports the Board's finding of an unfair labor practice, there is no longer any basis for the bargaining order. Obviously, the

sanction for an unfair labor practice cannot survive once the Board's finding of an unfair labor practice has been reversed.

### III. Conclusion

With respect to its withdrawal of recognition, we grant Tenneco's petition for review and deny the Board's cross-application for enforcement. The Board's decision regarding the withdrawal of recognition is reversed and the accompanying bargaining order is vacated.

Tenneco does not contest the Board's findings that it violated Section 8(a)(5) and (1) of the Act by refusing to provide the Union with requested information concerning Joseph Helton's discipline and work performed by an outside contractor during the strike, and refusing to process Steven Prysianzy's grievance to the third step. We therefore grant the Board's request for summary enforcement of its Order with respect to these violations. With respect to the other unfair labor practice charges at issue in this case, we deny Tenneco's petition for review and grant the Board's cross-application for enforcement.