# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3328

_____

Southern Bakeries, LLC

*Petitioner*

v.

National Labor Relations Board

*Respondent*

------------------------------

John Hankins

*Amicus on Behalf of Petitioner*

_____

No. 16-3509

_____

Southern Bakeries, LLC

*Respondent*

v.

National Labor Relations Board

*Petitioner*

------------------------------

John Hankins

*Amicus on Behalf of Respondent*

_____

National Labor Relations Board

_____

Submitted: April 6, 2017
Filed: September 27, 2017

_____

Before GRUENDER, MURPHY, and KELLY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Some production and sanitation employees of Southern Bakeries ("Southern" or "company") attempted several times to end their representation by the Bakery, Confectionary, Tobacco and Grain Millers Union, Local 111 ("union"). The National Labor Relations Board ("NLRB" or "Board") twice prevented union decertification votes due to Southern's unfair labor practices that would have tainted such votes. After employees later filed a withdrawal petition, the company withdrew its recognition of the union, and the union again filed an unfair labor practices charge. An administrative law judge ("ALJ") determined that Southern had committed a number of unfair labor practices that had tainted the withdrawal petition. A divided panel of the Board adopted the majority of the ALJ's rulings and, among other things, ordered the company to recognize and bargain with the union. Southern now petitions for review of the Board's order and the Board cross petitions for enforcement. For the reasons that follow, in substantial part we deny Southern's petition for review and grant the Board's cross petition to enforce its order. We also

grant the petition for review and deny the cross petition for enforcement as to several portions of the Board's order.

## I. Facts

Southern Bakeries is a commercial bakery that in 2005 purchased its facility from Meyer's Bakeries. Southern hired most of the employees and recognized the existing union as the bargaining representative for the approximate 200 production and sanitation employees. Southern and the union negotiated several subsequent collective bargaining agreements. The most recent expired in February 2012.

In 2009 a Southern employee petitioned the Board for an election to decertify the union. Most of the employees voted to retain the union. Another decertification petition was filed in December 2011. The union then alleged that Southern had engaged in unfair labor practices. No election was held after the Board determined that Southern had unlawfully assisted the decertification petition. These charges were later settled without Southern admitting fault.

Southern started restricting the union's access to its bakery in March 2012. The previous collective bargaining agreement had allowed the union bakery visits to ensure that the agreement was being honored. According to union representative Cesar Calderon, however, the union had in practice been free to meet with employees in the break area with no restrictions as to topic or frequency. Southern now repeatedly told the union that it could only discuss compliance with the previous collective bargaining agreement and could not lobby employees about the decertification efforts. Southern moved Calderon's visits to a small cubicle with only one chair and no table, and director of manufacturing Dan Banks threatened to call the police if Calderon met with employees in the break area. Subsequently, on March 23, Southern banned him from visiting with employees at the bakery after the company had allegedly received reports about his harassing employees. After some

seven months he and other union representatives were again allowed to visit with employees at the bakery. Southern continued to limit their access and emphasized that they were not permitted to solicit union support.

In May 2012, employee John Hankins filed a third decertification petition with the Board. It had been signed by a majority of bargaining unit employees. A decertification vote was scheduled for February 2013, but when union representatives came to the bakery in January 2013, they discovered that without notice or bargaining, Southern had installed surveillance cameras and divided the break area with plywood. The company claimed that it had installed the cameras to deter theft and replaced the windows with plywood to provide adequate ventilation.

Southern posted a memo to employees in January 2013 stating that the union appeared to have plans to take employees on strike as it had at Hostess bakeries, which had resulted in 18,000 lost jobs and 33 closed bakeries. Over the next month, Southern executive Rickey Ledbetter gave a series of mandatory speeches that between 150 and 170 bargaining union employees were required to hear. In the first speech he told them that unions can harm companies in many ways and leave less money for employee wages and benefits. Ledbetter specifically referred to Meyer's Bakeries and Hostess, stating that the strike at Hostess had caused 18,000 people to lose their jobs and 33 bakeries to be closed.

Ledbetter repeated similar points in later speeches. He said that strikes sometimes backfire and hurt employees and their families, that strikers can be permanently replaced, and that jobs can be lost at a striking facility. He told the employees that "[i]f a strike does succeed in crippling a company," it might thereafter be unable to meet customer demands and survive. He also added that Southern employees who were not represented by a union had received pay increases each year while the bargaining unit employees had not received raises in three of the prior five

-4-

years. The union thereafter filed unfair labor practice charges, and the Board declined to hold the decertification election that had been scheduled for February 2013.

Southern disciplined a number of pro union employees between March and May 2013. After Sandra Phillips discussed the closure of Hostess with another employee and gave him a related newspaper article, she was investigated and received a written warning. Vicki Loudermilk and Lorraine Marks were also investigated after discussing votes with another employee. After Marks left the production line for an emergency bathroom break of fewer than five minutes when no supervisor was available to give permission, she was suspended for six days. Southern officials also urged individual employees to oppose the union for their wages to increase and to avoid the kind of strike that purportedly caused Hostess to fail.

In June 2013 Hankins submitted a petition to the company signed by a majority of the bargaining unit employees. They asked Southern to withdraw recognition of the union which Southern did. The union did not regard its withdrawal as legitimate, however. Several months later, the company unilaterally raised employee wages by an average of 27 cents per hour without notice or bargaining.

The Board then filed its complaint against Southern. Before the ALJ issued a ruling on the charges, however, the Board filed a petition for injunctive relief. The district court then enjoined Southern from refusing to recognize the union. This injunction was later vacated by our court on the ground that the Board had not sufficiently shown a threat of irreparable harm, in part because the union lacked the support of most employees. See McKinney ex rel. NLRB v. S. Bakeries, LLC, 786 F.3d 1119 (8th Cir. 2015). Thereafter, the ALJ determined in the administrative proceeding that Southern had engaged in a number of unfair labor practices. The company and the Board's general counsel each filed exceptions to the ALJ's decision.

A three member panel of the Board largely affirmed in a split decision. The majority decided that Southern had interfered with employees' exercise of collective bargaining rights, thus violating § 8(a)(1) of the National Labor Relations Act ("NLRA" or "Act"). Southern had threatened discipline, job loss, and other unspecified reprisal for protected activity; interrogated employees about protected activity; created the impression of surveillance of such activity; assured employees that continued unionization was futile; promised benefits if they did not retain the union; disparaged the union; threatened closure of the company; and implemented a rule requiring that employees report harassment. The Board also determined that Southern had discriminated against employees to discourage unionization, in violation of § 8(a)(3) and (1), by investigating and disciplining Loudermilk, Marks, and Phillips because of their union activity. It finally concluded that the company had failed to bargain with the union, violating § 8(a)(5) and (1) of the Act, when it withdrew recognition from the union, unilaterally installed surveillance cameras in the break area, unilaterally changed the union's plant access rights, barring it from entering the plant for much of 2012 and after February 2013, and unilaterally increased employee wages in September 2013.

The Board ordered Southern to remedy these violations. Southern was ordered to cease its unlawful conduct, bargain with the union, restore union access rights, and reverse employee discipline. The third member of the panel concurred in part but dissented in part, arguing that although the company's campaign statements were lawful, its withdrawal of union recognition had not been because of the unfair labor practices it had committed. Southern then filed the current petition for review of the Board's order, and the Board filed a cross petition for enforcement. Southern claims that the Board erred by concluding that the company violated § 8(a)(1), (3), and (5). We will address each set of violations in turn.

## II. Analysis

When reviewing an NLRB order, we "afford[] great deference to the Board's affirmation of the ALJ's findings." Cintas Corp. v. NLRB, 589 F.3d 905, 912 (8th Cir. 2009) (internal quotation marks omitted). We will enforce the Board's "order as long as the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole." Id. (internal quotation marks omitted). We have defined substantial evidence to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotation marks omitted). To determine whether the Board's decision is supported by substantial evidence, we also consider adverse evidence. See Nichols Aluminum, LLC v. NLRB, 797 F.3d 548, 553 (8th Cir. 2015). Although the Board is permitted to draw reasonable inferences and may select between conflicting accounts of the evidence, it may not "rely on suspicion, surmise, implications, or plainly incredible evidence." Id. (internal quotation marks omitted). On legal issues, "we defer to the Board's interpretation of the Act, so long as it is rational and consistent with that law." NLRB v. Am. Firestop Sols., Inc., 673 F.3d 766, 768 (8th Cir. 2012).

### A. Section 8(a)(1) violations

Section 7 of the Act guarantees employees the right to organize and bargain collectively. See 29 U.S.C. § 157. Under § 8(a)(1), an employer commits an unfair labor practice if it "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of their rights" under § 7. Id. § 158(a)(1). Section 8(c) provides that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit," id. § 158(c), and thereby "implements the First Amendment," NLRB v. Gissel Packing Co., 395 U.S. 575, 617 (1969).

Southern argues that the Board erred in determining that it violated § 8(a)(1) of the NLRA by making a number of unlawful campaign statements that threatened plant closure, communicating that unionization was futile, promising benefits if the union was decertified, creating a harassment reporting rule, and disparaging the union. The company also challenges the Board's determination that it violated § 8(a)(1) by creating the impression that union activity was under surveillance, interrogating employees, and threatening discipline, job loss, and other reprisals. We will consider each of these determinations.

## 1. Plant closure threats

Southern claims that the Board erroneously determined that it violated § 8(a)(1) of the Act by threatening plant closure if the union was not decertified. The NLRA allows an employer to predict the effects of unionization only if such prediction is "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization." Gissel, 395 U.S. at 618. Under Gissel, the expression "of the employer's belief, even though sincere, that unionization will or may result in the closing of the plant" is a violation of § 8(a)(1) "unless, which is most improbable, the eventuality of closing is capable of proof." Id. at 618–19 (internal quotation marks omitted); see also NLRB v. Noll Motors, Inc., 433 F.2d 853, 854–56 (8th Cir. 1970).

In one of the captive audience meetings, Southern executive Rickey Ledbetter said to the company's employees:

> From an economic standpoint, we do not want a union because we believe it drags our Company down in so many ways. If we can't meet or beat the competition we can't survive. Just look at what happened to the Hostess Bakeries, Automobile companies and Steel companies. Unions strangled these companies to death. . . . There are lots of things

a union can do to hurt these ingredients for success.  Higher costs, less flexibility, lower productivity and loss of team unity can be crippling to a business and cost employees their jobs.

In another speech, Ledbetter told employees that "[j]ust because the contract is for a certain period of time doesn't mean that a company has to stay open or keep all of its employees during that period."

In a similar case, we determined that an employer violated § 8(a)(1) when it "called [employees'] attention to other plants in the community where employees had been laid off following their vote to unionize." Noll Motors, 433 F.2d at 854.  We concluded that "the employer's prediction was not carefully phrased to demonstrate probable consequences beyond [its] control nor to convey a management decision already arrived at to close the plant in case of unionization." Id. at 856.  Rather, the employer's statements were "phrased to predict that unionization would inevitably cause the plant to close, throwing employees out of work regardless of the economic realities." Id.; see also NLRB v. Mark I Tune-Up Ctrs., Inc., 691 F.2d 415, 417 (8th Cir. 1982) (per curiam).  We also conclude that substantial evidence supports the Board's determination that Southern's statements implied an unlawful threat that continued unionization would cause the bakery to close and employees to lose their jobs.  Although the company argues that it also assured employees that it would continue to work with them under the same conditions if the union prevailed, these assurances did not make its threats of plant closure lawful. Cf. A.P. Green Fire Brick Co. v. NLRB, 326 F.2d 910, 914 (8th Cir. 1964).

## 2.  Futility statements

Southern claims that the Board erred by determining that it violated § 8(a)(1) by communicating to employees that continued unionization was futile.  During captive audience meetings, Southern management told employees that the union

could only make promises but could not guarantee that they would come true. The company also told employees that the union would only win what the company was voluntarily willing to give and that "a union is powerless in guaranteeing changes." While the Board found that these statements suggested that unionization was futile, it did not determine that they contained a "threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). The Board therefore erred in determining that these statements violated the NLRA. See id.

### 3. Promises of benefits

The Board also determined that Southern had committed an unfair labor practice under § 8(a)(1) by promising employees benefits if they were to decertify the union. Southern argues that its speeches merely explained to employees the costs associated with dealing with a union and provided wage information for non union employees. In one speech, Ledbetter had stated the company's desire to "work together" with the union "to make Southern Bakeries a successful, competitive company that can provide greater job security and better wages and benefits for all of us." Later in the speech, he said, "If you think about the issue logically, you will know the answer to the question of what will happen to your wage, benefits and working conditions if the . . . union is voted out." These statements implied that Southern would provide benefits to employees if they voted out the union and therefore provide substantial evidence to support the Board's conclusion.

### 4. Harassment reporting rule

Southern disputes the Board's determination that it violated § 8(a)(1) by promulgating an unlawful reporting rule. In the speech at issue, Ledbetter instructed employees as follows:

Keep in mind that the company is not the only party to this election that has a right to state its views. The union has the same right—and so do you. The most important thing you can do for yourself in the weeks leading up to the election is learn and consider the facts—not rumors, not lies, not groundless fears, but facts. Some of you may have faced harassment or intimidation because you signed a decertification petition or otherwise oppose the union. If any of you are harassed or threatened on any basis during this election campaign, regardless of whether you are for or against the union, we want to know about it immediately so we can address the problem, just as we always have.

We will not tolerate the abuse of any employee rights in this work place. But to remedy the problem and prevent recurrence, you must bring it to our attention.

We have previously enforced an NLRB order finding that an employer violated § 8(a)(1) when it asked "its employees to report union solicitation activities." Bank of St. Louis v. NLRB, 456 F.2d 1234, 1235 (8th Cir. 1972) (per curiam). In that case, an executive had "received a report from supervisors that some employees were 'badgering and pestering' other employees during working hours to sign Union authorization cards." Id. He had then written a letter to employees stating, "[I]f you are threatened in any way or subjected to constant badgering by union proponents to sign these cards, please report these matters to your Department Head immediately." Id. The NLRB "concluded that in the context of the general anti-union tenor of the letter, the concluding paragraph could reasonably be interpreted by the employees to request the reporting to management of the names of employees who were engaging in persistent union solicitation," and we upheld the Board's determination. Id.

The facts in the present case are similar to those in Bank of St. Louis, and we conclude that substantial evidence supports the Board's determination that Ledbetter's statements were unlawful. Although the reporting rule was worded in neutral terms, it was announced by Ledbetter immediately after his comments about union

-11-

harassment of opponents. And while a statement encouraging employees to report harassment might appear harmless, Ledbetter's comments may have been understood to equate persistent union activity with harassment. The NLRA allows employees to "engage in persistent union solicitation even when it annoys or disturbs the employees who are being solicited." Brandeis Mach. & Supply Co. v. NLRB, 412 F.3d 822, 830 (7th Cir. 2005) (quoting Ryder Truck Rental, Inc., 341 N.L.R.B. 761, 761 (2004)). The company encouraged employees to report such purported "harassment" and stated that it would "address the problem." These statements may reasonably be understood as a threat of reprisal against employees who solicited their coworkers to support or oppose the union. Considering the statements in context, we conclude that the Board's determination that Ledbetter's statements were unlawful threats was supported by substantial evidence, regardless of whether "we might have reached a different decision had the matter been before us de novo." Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997).

### 5. Disparagement of union

The NLRB determined that Southern's campaign statements violated § 8(a)(1) of the NLRA by unlawfully disparaging the union in two ways. First, Southern stated that "[t]he union appear[ed] to have plans to take our employees out on strike" as it had at Hostess, which the Board interpreted as a threat that continued unionization would lead to a strike and plant closure. As discussed above, the Board's conclusion that this statement threatened plant closure was reasonable. We therefore uphold the Board's determination that the statement was unlawful.

The Board also concluded that Southern unlawfully disparaged the union "by appealing to racial prejudice" by its memo to employees stating that it had "raised concerns that the [union] was discriminating against Hispanics through targeted grievance allegations." The Board determined that this statement was unlawful because it was not supported by additional evidence. The Board's practice, however,

-12-

is not to "probe into the truth or falsity of parties' campaign statements." <u>U-Haul Co. of Nev., Inc.</u>, 341 N.L.R.B. 195, 195 (2004). Moreover, the NLRB has not shown that this statement was a threat to employees. <u>See</u> 29 U.S.C. § 158(c). The Board has not identified any case in which such a statement has been deemed unlawful disparagement because it alleges racial prejudice. The NLRB therefore erred in concluding that this statement was unlawful.

## 6. Impression of surveillance

Southern also argues that the Board erred in concluding that it violated § 8(a)(1) by creating the impression that protected activities were under surveillance when it installed surveillance cameras in the break area. We have previously concluded that "[c]reating an impression that a company keeps its employees' union activities under surveillance violates Section 8(a)(1) because it could inhibit the employees' right to pursue union activities untrammeled by fear of possible employer retaliation." <u>NLRB v. Chem Fab Corp.</u>, 691 F.2d 1252, 1258 (8th Cir. 1982). The company does not appear to dispute this rule but instead claims that the ALJ ignored evidence suggesting that employees would not have believed they were under surveillance.

The record contains substantial evidence to support the Board's conclusion. Southern installed cameras in the union's meeting space during the decertification efforts. The company argues that the cameras pointed only at storage racks and were installed as a response to employee complaints of theft from these racks. It also argues that it disconnected the camera in the small breakroom, covered it with a black garbage bag during union meetings, and received no employee complaint about these cameras. The company had, however, only disconnected the camera and covered it with a plastic bag after the union held at least one meeting with the camera uncovered. Based on the timing and location of the cameras, a reasonable employee could have felt that the company had surveilled protected activity for at least one

meeting before the camera was covered.  Cf. In re Stevens Creek Chrysler Jeep Dodge, Inc., 353 N.L.R.B. 1294, 1295–96 (2009).  We therefore conclude that substantial evidence supports the Board's conclusion that the cameras created an impression of surveillance, at least for a short period of time.

### 7.  Employee interrogations

The Board also determined that Southern violated § 8(a)(1) when it unlawfully interrogated employees Phillips, Loudermilk, and Marks for engaging in union activity.  The company argues that this finding violated its due process rights because it had lacked notice of the charge since the administrative complaint had mistakenly stated that these interrogations occurred during the captive audience meetings.  The Board determined that even though there was such an error in the complaint, Southern had still been put "on notice of the dates, the individuals, and the basic substance of the claim, and the parties fully litigated the matter."  The Board's decision issued after the company had received notice of the substance of the claim and the parties had litigated it, and we therefore decline to find a due process violation.  See McGraw-Edison Co. v. NLRB, 419 F.2d 67, 77 (8th Cir. 1969).

### 8.  Threats of discipline, job loss, and other reprisals

Southern disputes the ALJ's determinations that the company threatened employees with discipline, job loss, and other unspecified reprisals if they engaged in union activity.  The Board adopted these findings by the ALJ after observing that the company had merely offered conclusory exceptions and no argument in response to the ALJ recommendations (other than with respect to Southern's harassment reporting rule).  Since the record shows that Southern filed exceptions and arguments disputing the ALJ's determination, the Board erred in adopting the ALJ's recommendation as unopposed.  We therefore decline to enforce this portion of its order.

## B. Section 8(a)(3) violations

Southern next challenges the Board's determination with respect to § 8(a)(3) and (1) of the Act. The Board determined that Southern violated § 8(a)(3) and (1) by investigating and disciplining employees Loudermilk, Phillips, and Marks. The company does not meaningfully challenge the Board's conclusion with respect to Loudermilk. It does, however, argue that the Board erred with respect to Phillips and Marks.

Section 8(a)(3) of the NLRA prohibits employers from "discriminati[ng] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."[1]  29 U.S.C. § 158(a)(3). The NLRB applies the Wright Line analysis "when an employer articulates a facially legitimate reason for its [disciplinary] decision, but that motive is disputed." NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 780 (8th Cir. 2013); see also Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981). Under Wright Line, the Board's general counsel bears the initial burden "to establish that the employee's protected activity was a motivating factor in his or her eventual [discipline]." RELCO Locomotives, 734 F.3d at 780 (internal quotation marks omitted). The general counsel satisfies this burden by making a prima facie showing that "(1) the employee was engaged in protected activity; (2) . . . the employer knew of the employee's protected activity; and (3) . . . the employer acted as it did on the basis of anti-union animus." Id. (alterations in original) (quoting NLRB v. Rockline Indus., 412 F.3d 962, 966 (8th Cir. 2005)). "If the general counsel meets this burden, the conduct is unlawful unless the employer proves it would have taken the same action absent the protected activity." Id. (internal quotation marks omitted).

---

[1]Retaliation for protected activity that violates § 8(a)(3) is also a violation of § 8(a)(1). See Wilson Trophy Co. v. NLRB, 989 F.2d 1502, 1510 (8th Cir. 1993).

The company argues that the Board lacked sufficient evidence to support the determination that it disciplined Phillips for engaging in protected union related activity. Southern issued Phillips a written warning after she had brought an article about the Hostess closure onto the bakery floor and given it to another employee. The company claims that it disciplined Phillips under a legitimate rule banning newspapers on the floor in order to protect sanitation and safety. The Board determined that the company's investigation and discipline of Phillips showed, however, that it had been unlawfully motivated by anti union animus. Phillips testified that other unnamed employees regularly brought newspapers onto the floor and had not been investigated or punished. This testimony was sufficient to support the inference that Southern disciplined Phillips based on anti union animus. The company failed to prove it would have similarly disciplined her if she had not passed along a union related article. The Board's determination was thus supported by substantial evidence.

Southern similarly claims that the Board lacked sufficient evidence to support its determination that the company had unlawfully punished Marks for her union activity. Marks was an active union supporter, and the company issued her a one week suspension and final warning after she left her work area for five minutes to use the restroom, having been unable to find a supervisor to ask for permission. The Board adopted the ALJ's determination that this discipline was an unlawful response to her union activity and that the company had failed to show that it would have issued the same discipline if Marks had not been actively involved in the union. The record shows that other employees who took similar breaks had not received such harsh punishment. This evidence is sufficient to support the Board's determination that Southern was motivated by anti union animus, and the company did not prove otherwise.

-16-

## C. Section 8(a)(5) violations

Southern finally argues that the Board erred by determining that it failed to bargain with the union as required by § 8(a)(5) of the NLRA.[2] See 29 U.S.C. § 158(a)(5). The Board concluded that Southern had failed to meet its § 8(a)(5) obligations by installing surveillance cameras in the break area without first negotiating with the union,[3] restricting union access to the bakery, withdrawing recognition of the union in July 2013, and unilaterally increasing employee wages in September 2013.[4]

### 1. Union access to bakery

The Board determined that Southern violated § 8(a)(5) and (1) by limiting the union's access to the plant in a number of ways. First, it upheld the ALJ's finding that the company had barred the union from entering the bakery to visit with employees between March and November 2012. Southern argues that it banned only one union representative, Cesar Calderon, from the plant during that period, implying that other union representatives would have been allowed to meet with employees at the plant. The record shows, however, that Ledbetter refused access to another union official,

---

[2]A violation of § 8(a)(5) for failure to bargain with a union is also a violation of § 8(a)(1) because it interferes with employees' collective bargaining rights. See Metromedia, Inc., KMBC-TV v. NLRB, 586 F.2d 1182, 1188 (8th Cir. 1978).

[3]Southern does not dispute that it violated the Act by installing surveillance cameras without first bargaining or notifying the union. We therefore uphold the Board's determination on this matter.

[4]The company's only argument with respect to the September 2013 wage increase is that since its withdrawal of union recognition was lawful, it was under no obligation to bargain before raising wages. Because we uphold the Board's determination that the withdrawal of recognition was unlawful, as explained below, we also uphold the Board's determination that the wage increase violated § 8(a)(5).

David Woods, in July 2012. Even though Ledbetter offered conflicting testimony to the effect that union representatives other than Calderon would have been allowed to visit the plant, we conclude that there was sufficient evidence to support the Board's determination that the company had restricted all union access during this time.[5]

Southern also challenges the Board's conclusion that, even when union representatives were allowed to visit the bakery, the company had violated the NLRA because it only permitted union visits for the purpose of ensuring that the collective bargaining agreement was being followed. Although the agreement provided that a union representative would be allowed to visit the Southern plant after giving notice to the company for the purpose of ensuring that the agreement was being carried out, the Board adopted the ALJ's finding that in practice such visits had not been so limited. Under the NLRA, if "an employer has a past practice of providing union representatives access to its facilities, that past practice becomes a term and condition of employment that cannot be changed without first notifying and bargaining with the union to agreement or good faith impasse." Frankl ex rel. NLRB v. HTH Corp., 693 F.3d 1051, 1064 (9th Cir. 2012). To establish a past practice, however, the party bound by such a practice must have been aware of its existence. See In re Regency Heritage Nursing & Rehab. Ctr., 353 N.L.R.B. 1027, 1027–28 (2009).

We conclude that the Board has not provided evidence that the company was aware that the union had been using its visits to conduct any business other than monitoring performance of the collective bargaining agreement. The Board therefore erred by finding Southern violated the NLRA by making efforts to restrict the union's visits other than those described in the collective bargaining agreement. The Board

---

[5]Southern also disputes the determination that at other times it barred union visits when the company's union steward was not scheduled to work. Since resolution of the union steward issue is not necessary to support our decision that the company violated § 8(a)(5) by banning union access, we decline to address the issue. See NLRB v. Curtin Matheson Sci., Inc., 494 U.S. 775, 788 n.8 (1990).

however did not err in determining that the company violated § 8(a)(5) and (1) by unilaterally restricting union meetings to a cubicle because the union's meeting space was a subject of mandatory bargaining. See BASF Wyandotte Corp., 274 N.L.R.B. 978, 980 (1985), enforced, 798 F.2d 849 (5th Cir. 1986).

## 2. Withdrawal of recognition

The NLRB concluded that Southern committed an additional violation of § 8(a)(5) when it withdrew recognition of the union based on the June 2013 withdrawal petition. The Board concluded that this petition had been tainted by the company's unfair labor practices and therefore ordered the company to continue recognizing and bargaining with the union. Southern challenges the Board's bargaining order.

A union generally "enjoys a presumption that its majority representative status continues." Bryan Mem'l Hosp. v. NLRB, 814 F.2d 1259, 1262 (8th Cir. 1987). This "presumption can only be rebutted by a good faith belief of the employer, based on objective factors, that the union has lost its majority status." NLRB v. Am. Linen Supply Co., 945 F.2d 1428, 1433 (8th Cir. 1991). The "employer is not permitted, however, to rely on a union's loss of majority support caused by the employer's own unfair labor practices." Radisson Plaza Minneapolis v. NLRB, 987 F.2d 1376, 1383 (8th Cir. 1993). To determine "whether a causal relationship exists between the unremedied unfair labor practices and the subsequent expression of employee disaffection with an incumbent union," the Board considers factors including:

> (1) the length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the violations, including the possibility of a detrimental or lasting effect on employees; (3) the tendency of the violations to cause employee disaffection; and (4) the effect of the unlawful conduct on employees' morale, organizational activities, and membership in the union.

-19-

In Re Miller Waste Mills, Inc., 334 N.L.R.B. 466, 468 (2001), enforced, 315 F.3d 951 (8th Cir. 2003).

Violations are more likely to "have detrimental and lasting effects" if they involve "coercive conduct such as discharge, withholding benefits, and threats to shutdown the company operation." Tenneco Auto., Inc. v. NLRB, 716 F.3d 640, 650 (D.C. Cir. 2013). Here, Southern's unfair labor practices included implicitly threatening to close its bakery, promising benefits if the union was decertified, punishing employees for union activity, and restricting the union's access to the bakery. Given the nature and extent of Southern's unfair labor practices in the months leading up to the June 2013 withdrawal petition, as described above, we conclude that substantial evidence supports the Board's conclusion that the company had tainted such petition.

Southern argues that the Board erred in ordering it to bargain with the union because a majority of bargaining unit employees opposed the union, as shown by the December 2011 and May 2012 decertification petitions. The 2011 petition did not show that the union lacked majority support, however, because, as the Board determined at the time, Southern had assisted in that petition, leading to an unfair labor practice charge that was later settled. A decertification petition that has been assisted by the employer is tainted and does not show a lack of majority support. See Am. Linen, 945 F.2d at 1433–34.

The 2012 petition also failed to show a lack of majority support for the union because Southern's unfair labor practices had tainted this petition. In the company's previous appeal of the bargaining injunction, we stated that "the unrefuted evidence before us indicates a majority of Southern Bakeries' employees have not supported the Union since at least May 2012 when Hankins circulated his first petition." McKinney, 786 F.3d at 1124. We explained that "[a]lthough the Director alleged Southern Bakeries solicited the 2011 petition, an allegation the Company settled

while denying any fault, the Director has not pointed to evidence suggesting the 2012 petition is not a genuine reflection of employee sentiment." Id. at 1124 n.5.

On its current appeal, however, the Board has produced evidence that the company first limited—then barred—union access to the bakery during the two months before the May 2012 decertification petition. Beginning on March 20, Southern had restricted the union representative's access to the breakroom so Calderon could then only meet with employees in the adjacent vending machine area. Although Banks did offer to contact any employee with whom Calderon wanted to meet, he would do so only after Calderon identified the employee as well as the topic for discussion. The meeting area was visible to management, and employees were aware that anyone in attendance could be observed. Three days later, on March 23, Southern banned Calderon from any visits to bakery employees during the work day, allegedly because of harassment complaints not found credible by the ALJ. On this record there was sufficient evidence to support the Board's findings that the 2012 petition was tainted by the company's unfair labor practices.

## III. Conclusion

For these reasons we grant Southern's petition for review in part and deny it in part, and grant the Board's cross petition for enforcement in part and deny it in part, as described above.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

By its own terms, the National Labor Relations Act ("NLRA") is designed to protect workers, not unions. *See* 29 U.S.C. § 157; *see also, e.g.*, *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 532 (1992) ("[T]he NLRA confers rights only on *employees*, not on unions or their nonemployee organizers."). Notwithstanding this clear statutory mandate, the Board's decision protects a union at the expense of employees. It does

-21-

so by trumpeting several alleged unfair labor practices ("ULPs"), the majority of which are unsupported by substantial evidence. Because I believe that "[t]he wrongs of the parent should not be visited on the children, and the violations of [this employer] should not be visited on these employees," *Overnite Transp. Co.*, 333 N.L.R.B. 1392, 1398 (2001) (Member Hurtgen, dissenting), I respectfully dissent from the bulk of the court's opinion.[6]

## I.

Southern Bakeries ("SBC" or "the Company") operates a commercial bakery in Hope, Arkansas. SBC began operations in 2005, when it purchased assets from the defunct Meyer's Bakeries and hired most of its employees. As Meyer's successor, SBC recognized the Bakery, Confectionary, Tobacco Workers and Grain Millers International Union, Local 111 ("BCTGM" or "the Union") as the collective-bargaining agent for the two hundred or so employees in its production and sanitation unit. The Company and the Union subsequently entered into several collective bargaining agreements ("CBAs"), the most recent of which expired in February 2012.

Employee-led efforts to remove BCTGM started a few years after SBC took over the bakery. In 2009, an SBC employee filed a "decertification petition" seeking to oust BCTGM. The National Labor Relations Board ("NLRB" or "the Board") held an election, but a majority of employees voted to retain the Union. Two years later, employee Nadine Pugh led another decertification campaign. Although a majority

---

[6]While I might have reached a different conclusion if unencumbered by the deference we accord agency determinations, I concur in sections II.A.6-7 and II.B as to the findings that Southern created an impression of surveillance, interrogated certain employees, and unlawfully investigated and disciplined these employees. I also agree that Southern did not communicate that unionization was futile, disparage unions, or threaten discipline or other reprisals, per sections II.A.2, II.A.5, and II.A.8.

of unit employees called for BCTGM's ouster in this new petition, the Union filed "blocking charges." SBC ultimately settled the allegations with the Board without admitting fault, but the Board never held an election.

In May 2012, employee-amicus John Hankins filed yet another decertification petition that was signed by 59 percent of unit employees. This prompted the NLRB to schedule a new decertification election for February 7, 2013. Over the intervening eight months, SBC and the Union continued a long-running dispute over BCTGM's access to the facility. Also during the campaign period, in January and early February 2013, SBC made its opposition to the Union known in several ways. First, the Company posted a memorandum suggesting that the Union was planning to lead a strike similar to one it organized at Hostess Bakeries, which SBC tied directly to the loss of more than 18,000 jobs at Hostess. Second, SBC's executive vice president and general manager, Rickey Ledbetter, gave a series of captive-audience speeches intended to highlight certain negative facts about unionization. These speeches were critical of unions in general and of BCTGM in particular. For instance, Ledbetter repeatedly referenced the Hostess layoffs and suggested that unions had "strangled" Hostess and a variety of companies in other industries. At the same time, Ledbetter assured employees that SBC would not retaliate if BCTGM won the election and pledged to continue bargaining with the Union if it were retained. Additionally, he told employees, "If any of you are harassed or threatened on any basis during this election campaign, *regardless of whether you are for or against the [U]nion*, we want to know about it immediately so we can address the problem, just as we always have. We will not tolerate the abuse of *any employee rights* in this work place." *See ante* at 11 (emphasis added). After these speeches, the Union filed another set of blocking charges, and the NLRB once again postponed the election pending an investigation.[7]

---

[7]As this court once observed in another blocking-order case, "it appears clearly inferable . . . that one of the purposes of the Union in filing the unfair practice charge[s] was to abort [the] petition for an election." *See NLRB v. Hart Beverage*

-23-

Undeterred, but frustrated by what he considered to be stall tactics, Hankins changed strategy. Based on the advice of the National Right to Work Foundation, he and another employee circulated a "withdrawal petition," which would allow for the end of BCTGM representation without an election. Out of 200 unit employees, 66 percent signed the withdrawal petition calling for the Union's ouster. In July 2013, after verifying the authenticity of the signatures, SBC withdrew recognition of BCTGM, denied further Union access to the plant, ceased dues checkoffs, and, several months later, raised employee wages by an average of 27 cents per hour.

In response, the NLRB Regional Director filed a consolidated complaint against SBC with the Board on January 10, 2014. An administrative law judge ("ALJ") held a four-day hearing on the matter the following month. In mid-July 2014, the ALJ issued a decision finding that SBC committed a series of ULPs that together "spawned significant disaffection." Specifically, the ALJ held that SBC had violated section 8(a)(1) of the NLRA, by interrogating employees about their union activities, making unlawful campaign statements, promulgating a harassment-reporting rule, and disparaging the Union; sections 8(a)(3) and 8(a)(1), by investigating and disciplining certain employees; and sections 8(a)(5) and 8(a)(1), by unilaterally installing two cameras in the break area, changing BCTGM's access rights, wrongfully withdrawing recognition of the Union, and unilaterally raising employee pay after the BCTGM's ouster. *See ante* at 6 (explaining the specific allegations in greater detail). Based on these findings, the ALJ ordered SBC to recognize and bargain with BCTGM as the collective-bargaining representative for unit employees, among other remedies.

Prior to the issuance of the ALJ decision, in February 2014, the NLRB Regional Director sought section 10(j) injunctive relief in federal court to force SBC

---

*Co.*, 445 F.2d 415, 420 (8th Cir. 1971). *See generally* Brief for John Hankins as *Amicus Curiae* at 2 n.2 (discussing the strategic use of blocking charges).

to bargain with BCTGM. On August 14, 2014, the district court granted the NLRB's request to reinstate the Union with immediate effect. SBC then appealed the grant of the injunction, and we reversed in *McKinney ex rel. NLRB v. S. Bakeries, LLC*, 786 F.3d 1119, 1126 (8th Cir. 2015). Specifically, we held that the district court abused its discretion in granting the injunction because there was no threat of irreparable harm in allowing the case to go through the Board's normal adjudicatory process. *Id.* at 1125. Central to this holding was the fact that "the Union lacked majority support for nearly two years before the Director filed her § 10(j) petition." *See id.* While acknowledging that there was no need to "resolve whether the Company's allegedly unlawful activities caused the employees' disaffection [reflected in the withdrawal petition]," *id.* at 1124, we found that "the unrefuted evidence before us indicate[d] a majority of [SBC] employees ha[d] not supported the Union since at least May 2012 when Hankins circulated his first petition," *id.* In other words, although the February 2013 vote had been canceled, there was no indication that the petition represented anything other than a "genuine reflection of employee sentiment," *id.* at 1124 n.5, confirming evidence that BCTGM "had long been out of favor," *id.* at 1125.

Meanwhile, both parties filed exceptions to the initial ALJ decision, and a three-member panel of the Board adopted the ALJ's findings and conclusions in nearly all respects. *S. Bakeries, LLC*, 364 N.L.R.B. No. 64, at *1 (Aug. 4, 2016). Where the Board departed, it did so in favor of the Union. For example, the Board accepted the NLRB General Counsel's exceptions regarding SBC's promulgation of a harassment-reporting rule and interrogation of employees. *Id.* at *1, *5-7. It also affirmed the ALJ's determination that SBC engaged in various unlawful campaign activities. *Id.* at *2-5. Member Miscimarra dissented as to the findings concerning campaign statements, the harassment-reporting rule, and disparagement of the Union. *Id.* at *9-10 (Member Miscimarra, dissenting in part). Additionally, the Board ordered the reinstatement of the Union. SBC now appeals this order, as well as each of the ULP findings, and the Board cross-petitions for enforcement of its order.

## II.

My primary concern with the Board's decision is that, based on a number of questionable findings, it imposes BCTGM on an unconsenting group of workers who have repeatedly indicated a desire to be free from its representation. Worse still, the resulting harm to employees could go on indefinitely, as the bargaining order blocks any future decertification election until the NLRB determines that a "reasonable time" has passed. *See Lee Lumber & Bldg. Material Corp. v. NLRB*, 117 F.3d 1454, 1460 (D.C. Cir. 1997) (per curiam). Given my view that "the Board's actions in this matter are more consistent with the role of an advocate than an adjudicator," *see Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 642-43 (D.C. Cir. 2017), I would not make employees wait any longer to exercise their free will.

"We review appeals from the National Labor Relations Board with deference," *NLRB v. Hardesty Co., Inc.*, 308 F.3d 859, 862 (8th Cir. 2002), and "[w]e will enforce the Board's order if [it] correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole," *ConAgra Foods, Inc. v. NLRB*, 813 F.3d 1079, 1084 (8th Cir. 2016) (quotation omitted); *see also Fred Meyer Stores*, 865 F.3d at 636 ("Judicial review of NLRB determinations in unfair labor practice cases is generally limited, but not so deferential that the court will merely act as a rubber stamp for the Board's conclusions." (citation omitted)). While we defer to the Board's interpretation of the NLRA so long as it is rational and consistent with the statute, *Cellular Sales of Mo., LLC v. NLRB*, 824 F.3d 772, 775 (8th Cir. 2016), we review all other conclusions of law *de novo*, and we are "not obligated to defer to [the Board's] interpretation of Supreme Court precedent under *Chevron* or any other principle," *Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1054 (8th Cir. 2013) (quotation omitted). As for factual findings, we have explained that "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *ConAgra Foods*, 813 F.3d at 1084 (citation omitted). We also are required, however, to consider adverse evidence and

to weigh the strengths and weaknesses of the Board's inferences. *Nichols Aluminum, LLC v. NLRB*, 797 F.3d 548, 553 (8th Cir. 2015). While the Board is permitted to draw reasonable inferences based on the record, it cannot rely on "suspicion, surmise, implications, or plainly incredible evidence." *Id.* (citation omitted). Because several of the Board's conclusions regarding the alleged violations of sections 8(a)(1) and 8(a)(5) either are not supported by substantial evidence or are based on a misapplication of governing law, I respectfully dissent from the portions of the court's opinion upholding these findings.

## A. Section 8(a)(1) violations

Section 7 of the NLRA guarantees employees "the right . . . to form, join, or assist labor organizations, to bargain collectively . . . and to engage in other concerted activities for the purpose of collective bargaining [as well as] the right to refrain from any or all of such activities." 29 U.S.C. § 157. Section 8(a)(1), in turn, makes it an unfair labor practice for employers "to interfere with, restrain, or coerce employees in the exercise of [their] rights" under section 7. *Id.* § 158(a)(1). At the same time, an employer retains the right to communicate to employees "any of his general views about unionism or any of his specific views about a particular union . . . so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969) (quoting 29 U.S.C. § 158(c)); *see also Fred Meyer Stores*, 865 F.3d at 642 ("[W]ords of disparagement alone concerning a union or its officials are insufficient for finding a violation of Section 8(a)(1)." (citation omitted)); *Children's Ctr. for Behavioral Dev.*, 347 N.L.R.B. 35, 35 (2006) ("[A]n employer may criticize, disparage, or denigrate a union without running afoul of Section 8(a)(1), provided that its expression of opinion does not threaten employees or otherwise interfere with the Section 7 rights of employees."). *See generally* U.S. Const. amend. I.

The Board found that SBC committed eight ULPs under section 8(a)(1), and the court affirms five of these determinations. *See ante* at 9-10, 12-14. I believe that the Board erred in its conclusions concerning three of the remaining five purported unfair labor practices—that SBC threatened plant closure, promised benefits, and promulgated an unlawful rule—because its findings impermissibly relied on suspicion and implications and failed to adequately account for adverse evidence.

## 1. Threats of plant closure

The Board's conclusion that SBC unlawfully threatened plant closure involved three related errors. First, the Board incorrectly applied the Supreme Court's decision in *NLRB v. Gissel Packing Co.* by implying that Ledbetter's statements were predictions about "precise effects." *See* 395 U.S. at 618. Second, the Board misinterpreted as threats Ledbetter's comments about the potential economic effects of union retention. Finally, the Board gave insufficient weight to the numerous instances in which SBC expressed its commitment to continue bargaining with the Union if it were retained, mitigating any reasonable perception of a threat.

### a. No predictions of "precise effects"

The Board applied the wrong standard in concluding that Ledbetter's campaign statements were unlawful because they were not "carefully phrased on the basis of objective fact." *See S. Bakeries*, 364 N.L.R.B. No. 64, at *4 (quoting *Gissel*, 395 U.S. at 618). Under *Gissel*, not all campaign speech is required to meet this stringent standard. *See* 395 U.S. at 618. Rather, the "carefully phrased" requirement applies only to an employer's statements that "make a prediction as to the *precise effects* he believes unionization will have on his company." *Id.* (emphasis added).

Notwithstanding the Board's insinuations to the contrary, the record betrays no indication that Ledbetter made a single "prediction" of the "precise effects" that

-28-

retaining BCTGM would have on employees, such as layoffs or closure. Instead, as dissenting Member Miscimarra explained, "Ledbetter merely conveyed general views about unionization (e.g., that unions have 'strangled' companies in various industries) and views on a particular union (that the BCTGM had contributed to the demise of Hostess)." *S. Bakeries*, 364 N.L.R.B. No. 64, at \*15 (Member Miscimarra, dissenting in part). Even Ledbetter's statements about the potential impact that a retention vote could have on SBC's success in a competitive market were cabined to general observations about how unions can affect a company's ability to compete. "Of course the employees are free to draw their own conclusions therefrom, but employee conclusions are certainly not to be viewed as employer predictions." *Michael's Markets*, 274 N.L.R.B. 826, 826 (1985); *see also Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1134 (D.C. Cir. 1994) (finding that a letter could not be read to threaten plant closure because it linked job preservation to the plant's ability to compete regardless of unionization); *EDP Med. Comput. Sys., Inc.*, 284 N.L.R.B. 1232, 1264 (1987) (holding that employers have a "right to . . . stat[e] 'economic reality' by informing employees of [unionized companies that had closed].").

The Board erroneously imposed *Gissel*'s "carefully phrased" requirement on all campaign speech involving "predictions." However, as the D.C. and Sixth Circuits have held in interpreting *Gissel*, such general commentary does not trigger the "carefully phrased" standard. *See, e.g.*, *Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1173 (D.C. Cir. 1998) (concluding that statements such as "loss to employees was an inevitable consequence of their unionizing" are "partisan, but largely permissible"); *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 369 (6th Cir. 1993) ("[A]n employer may make predictions of consequences that will occur no matter how well disposed the company is toward unions, and such predictions are not unlawful threats of retaliation . . . [where] nothing in the record demonstrates that the predicted consequences were driven by [the employer's] desire to punish employees for a pro-union vote."), *abrogated on other grounds by Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996). These circuits instead preserve the "highly desirable

-29-

[exchange of ideas wherein] employees involved in a union campaign . . . hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right." *NLRB v. Lenkurt Elec. Co.*, 438 F.2d 1102, 1108 (9th Cir. 1971). As such, I would follow these courts in concluding that there are campaign predictions, like Ledbetter's, that do not trigger the "carefully phrased" requirement.

### b. Economic predictions and historic references

The Board also erred by misconstruing SBC's campaign statements as threats of plant closure. While there is often a risk that employer predictions concerning the consequences of unionization could be interpreted as a pledge to effectuate them, that danger alone is insufficient to convert such predictions into unlawful threats of reprisal. *See NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1367 (7th Cir. 1983) (distinguishing between predictions of inevitability and threats of retaliation). Based on their plain meaning, the comments at issue here merely conveyed SBC's opinions as to the potential economic repercussions that might accompany union retention, based in part on a historical reference to the Hostess layoffs and other past plant closures. Nevertheless, in a single, conclusory sentence, the court suggests that SBC's references to the Hostess closure and Ledbetter's speeches were "phrased to predict that unionization would inevitably cause the plant to close" and thus constituted an implicit threat against union retention. *See ante* at 9 (quoting *NLRB v. Noll Motors, Inc.*, 433 F.2d 853, 856 (8th Cir. 1970)).

Yet, "as the dictionaries tell us, a 'threat of reprisal' means a 'threat of retaliation' and this in turn means not a prediction that adverse consequences will develop but a threat that they will be *deliberately inflicted* in return for an injury—'*to return evil for evil*.'" *Crown Cork & Seal Co.*, 36 F.3d at 1138 (citation omitted). "For a statement to constitute a threat, it must at least purport to describe an action *the speaker or author* of the statement may take." *S. Bakeries*, 364 N.L.R.B. No. 64, at *12 (Member Miscimarra, dissenting in part). Neither the court nor the Board

point to a single instance where Ledbetter predicted "the precise effects that continued unionization would have on the Hope bakery, and he certainly did not either state or predict that the Hope bakery would close unless employees voted to decertify the Union." *Id.* at *15. In discussing how SBC might respond to retention, Ledbetter did not so much as hint at retaliation or otherwise imply that the Company would "throw employees out of work regardless of the economic realities." *See Gissel*, 395 U.S. at 619. Rather, he described only what the Union might do and the economic impact that could result.

An employer is free to tell employees "what he reasonably believes will be the likely economic consequences of unionization that are outside his control," as distinguished from "threats of economic reprisal to be taken solely on his own volition." *Id.* at 619 (citation omitted). Otherwise, "[i]f § 8(c) does not permit an employer to counter promises of pie in the sky with reasonable warnings that the pie may be a mirage, it would indeed keep Congress' wor[d] of promise to the ear but break it to the hope." *NLRB v. River Togs, Inc.*, 382 F.2d 198, 202 (2nd Cir. 1967). Accordingly, I believe the Board erred by inferring unlawful threats from SBC's economic predictions about unionization and references to relevant historic events.

### c. Commitment to continued good-faith bargaining

The final consideration weighing against the Board's finding that SBC threatened plant closure is that SBC repeatedly and consistently committed to bargain with the Union if employees voted for retention. In his speeches, Ledbetter reiterated this point in various ways, such as: "I want to stress that if the [U]nion were somehow to win the election and continue to represent you, we wouldn't reduce wages, benefits, or working conditions just because the [U]nion won." These and other similar pledges led Member Miscimarra to conclude that SBC effectively conveyed the sentiment that "[the Company] would continue to bargain in good faith with the Union . . . [and] would not retaliate by making unfavorable changes 'just because the

-31-

[U]nion won.'" *S. Bakeries*, 364 N.L.R.B. No. 64, at *16 (Member Miscimarra, dissenting in part). The Board inexplicably discounted these statements solely on the basis of the general anti-union tenor of the campaigning speeches. This represents a failure to properly consider adverse evidence.

In sum, I believe the Board's conclusion that SBC implicitly threatened plant closure is not supported by substantial evidence because the campaign statements at issue did not involve predictions of precise effects, because these statements cannot reasonably be interpreted as threats, and further, because SBC assured employees of its willingness to continue bargaining with the Union if it were to win retention.

## 2. Promises of benefits

The Board's finding that SBC unlawfully promised benefits is likewise unsupported by substantial evidence. As noted above, SBC has a statutorily protected right to comment on the potential economic consequences of unionization. *See River Togs*, 382 F.2d at 202 (citing 29 U.S.C. § 158(c)). Further, employers "may make truthful statements to employees concerning benefits available to their represented and unrepresented employees, may compare wages and benefits at their unionized and non-unionized facilities, and may offer an opinion, based on such comparisons, that employees would be better off without a union." *Unifirst Corp.*, 346 N.L.R.B. 591, 593 (2006). Here, SBC provided employees with wage information for non-represented employees, which showed that these workers received higher pay and more frequent raises than their unionized colleagues. Also, in one speech, Ledbetter said, "If you think about the issue logically, you will know the answer to the question of what will happen to your wage, benefits and working conditions if the . . . [U]nion is voted out." Yet, earlier in the same speech, he described SBC's desire to work with the Union to find a balance between competitiveness, wages, and job security.

The Board read these expressions as an implied promise of wage increases in exchange for decertification. In reality, however, the statements merely explained that SBC would have more money if not for the expenses associated with unionization—such as administrative costs and legal fees—and suggested that some of the added funds could flow to employees. Of course, employees also would enjoy direct savings by avoiding union dues. In these respects, this case is similar to *Deer Creek Mining Co.*, 308 N.L.R.B. 743 (1992). There, the Board found no implied promise in an employer's verbal acknowledgement that "the costs of existing union benefits plans were so high that the [employer] could not afford to pay them without reducing existing wages." *Id.* at 743. Similarly, Ledbetter's statements conveyed objective economic facts beyond SBC's control. As such, substantial evidence does not support the conclusion that SBC made an implied promise of benefits.

### 3. Harassment-reporting rule

While I accept the Board's finding that SBC's application of its harassment-reporting policy violated section 8(a)(3), I disagree that the promulgation of this rule was itself an independent violation of section 8(a)(1)—if indeed Ledbetter's comment can be interpreted as a rule at all. *See S. Bakeries*, 364 N.L.R.B. No. 64, at *17-18 (Member Miscimarra, dissenting in part) ("Ledbetter did not issue a generally applicable directive or rule, and he did not threaten anyone with discipline if they neglected to report being harassed or threatened. Rather, Ledbetter indicated a desire to know if anyone were threatened or harassed."). It strains credulity to suggest that encouraging employees to report harassment would "reasonably tend to chill employees in the exercise of their Section 7 rights," *see Lafayette Park Hotel*, 326 N.L.R.B. 824, 825 (1998), *enforced*, 203 F.3d 52 (D.C. Cir. 1999). The court cites *Bank of St. Louis v. NLRB* in support of its position that the promulgation of a harassment-reporting requirement constitutes a ULP. *See ante* at 11 (citing 456 F.2d 1234, 1235 (8th Cir. 1972) (per curiam)). However, *Bank of St. Louis* involved a rule requiring employees to report only union-solicitation activities. 456 F.2d at 1235.

-33-

Ledbetter's neutral harassment-reporting policy—which covered all employees, "whether [they were] for or against the union"—is far different.

Furthermore, employees could not "reasonably construe" the plain wording of SBC's purported rule to prohibit protected speech, as it targeted only harassment, which falls outside the protection of section 7. The Board ignores the fact that "[h]arassment and intimidation are not protected union activities" and that "offensive, hostile language and threats are not protected even if under the guise of union activity." *NLRB v. Arkema, Inc.*, 710 F.3d 308, 316 (5th Cir. 2013). Although employees are certainly allowed to engage in union solicitation and employers cannot treat this protected activity as harassment, SBC has a right and a responsibility to create a workplace environment free from harassment and threats. *See Martin Luther Mem'l Home, Inc.*, 343 N.L.R.B. 646, 648-49 (2004) (holding that rules prohibiting harassment were lawful because "employees have a right to a workplace free of unlawful harassment, and both employees and employers have a substantial interest in promoting a workplace that is 'civil and decent'" (citation omitted)). The timing of Ledbetter's statement coincided with the period when harassment was most likely to occur, the prohibited conduct is clearly distinguishable from legitimate solicitation, and the context of the alleged rule, taken together, suggest that SBC wanted to protect against abusive activity in light of an increasingly acrimonious campaign. Moreover, the policy contained no threat of sanction and applied to both sides of the debate; it simply was an invitation to employees on all sides to bring incidents of harassment to the attention of the Company. This neutral wording also belies the argument that the policy was promulgated in response to protected activity. Unlike the court, I would not require employers to hesitate before acting to maintain order in the workplace for fear of being held to task by the Board.

## B. Section 8(a)(5) violations

Section 8(a)(5) makes it "an unlawful labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees." 29 U.S.C.

§ 158(a)(5). An employer violates this section by failing to notify or bargain with a union before changing the terms and conditions of employment. While I agree with the court that SBC impermissibly installed two surveillance cameras in the break area without negotiation, I respectfully dissent from its findings that the Company violated section 8(a)(5) by restricting Union access to the facility, withdrawing recognition of the Union in July 2013, and increasing wages shortly thereafter.

### *1. Union access rights*

First, the Board lacked substantial evidence to support its finding that SBC "prohibit[ed] *all access* between March and November 2012, and at other times thereafter." *S. Bakeries*, 364 N.L.R.B. No. 64, at *31-32 (emphasis added). At most, SBC temporarily barred one BCTGM representative (Cesar Calderon) after repeatedly warning him of numerous violations of the CBA and denied access to a second representative (David Woods) until he read the terms of the CBA—both while expressing a willingness to allow visits from other nonemployee union representatives. As the D.C. Circuit recently explained, "nonemployee union agents on an employer's premises for the purpose of communicating with represented employees are engaged in activities protected by Section 7 of the [NLRA] *only to the extent* that they comply with the parties' contractual access clause." *Fred Meyer Stores*, 865 F.3d at 637. Accordingly, "to establish a NLRA violation, the General Counsel of the NLRB carries the burden to show the Union representatives were in compliance with the parties' Access Agreement." *Id.* (citation omitted). Because the CBA created only a limited visitation right "for the purpose of seeing that the Agreement is being observed" and because BCTGM violated the terms of the CBA on numerous occasions, I believe SBC had the right to exclude the two representatives in question. More importantly, the Board offered no evidence rebutting SBC's claim that it would have allowed other Union representatives to visit during the alleged period of exclusion. Thus, because the Board failed to meet its

burden and because substantial evidence does not support its factual determinations, I would conclude that SBC did not violate section 8(a)(5) by restricting union access.

## 2. Withdraw of recognition

Second, I disagree that SBC unlawfully withdrew recognition from BCTGM as the unit's collective-bargaining representative because the Union had lost majority support, thereby compelling—or, at the very least, permitting—the Company to take this course of action. *See Tenneco Auto., Inc. v. NLRB*, 716 F.3d 640, 648 (D.C. Cir. 2013) ("When an employer has objective evidence that a union has lost majority support, such as 'a petition signed by a majority of the employees in the bargaining unit,' it may unilaterally withdraw recognition." (citation omitted)); *Levitz Furniture Co.*, 333 N.L.R.B. 717, 724 (2001) (holding that, "[u]nder Board law, if a union *actually* has lost majority support"—as opposed to its status merely being in doubt—"the employer *must* cease recognizing it" (emphasis added)). As the court correctly notes, however, employers are not permitted "to rely on a union's loss of majority support caused by the employer's own unfair labor practices." *See ante* at 9 (quoting *Radisson Plaza Minneapolis v. NLRB*, 987 F.2d 1376, 1383 (8th Cir. 1993)). Thus, the crux of this issue—and the very heart of this appeal—centers on whether the Company's ULPs *caused* employees disaffection with the Union. Because I believe that the Board lacked substantial evidence to establish a causal link between any remaining unfair labor practices and the Union's loss of support, I would reverse the Board decision as to this finding and vacate its order reinstating BCTGM.

"*Gissel* bargaining orders," which compel employers to recognize a union, are an "extreme remedy" and are "justified only in 'exceptional circumstances'" because they deny employees free choice regarding unionization. *Skyline Distribs. v. NLRB*, 99 F.3d 403, 411 (D.C. Cir. 1996) (citations omitted); *see also id.* at 410 ("[A] bargaining order is not a snake-oil cure for whatever ails the workplace." (citation omitted)). In fact, "[t]here could be no clearer abridgment of § 7 of the Act . . . [than]

grant[ing] exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority." *Int'l Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 737 (1961). For this reason, "courts have been strict in requiring the Board to justify [such] orders" and have required an explanation as to why a less intrusive remedy would be inadequate. *Skyline Distribs.*, 99 F.3d at 410-11. *Gissel* bargaining orders cannot be enforced simply because an employer engaged in even "numerous unfair labor practices," *see Harper & Row Publishers, Inc. v. NLRB*, 476 F.2d 430, 435 (8th Cir. 1973), as "not every unfair labor practice will taint evidence of a union's subsequent loss of majority support," *Lexus of Concord, Inc.*, 343 N.L.R.B. 851, 852 (2004). Instead, "the Board has the burden of adducing substantial evidence to support its finding that an employer's unfair labor practices have 'significantly contributed' to the erosion of a union's majority support." *Tenneco*, 716 F.3d at 648 (citation omitted).

Where, as here, "the unfair labor practices do not involve a general refusal to recognize and bargain with the union, 'there must be specific proof of a causal relationship between the unfair labor practice[s] and the ensuing events indicating a loss of support.'" *Champion Enters., Inc.*, 350 N.L.R.B. 788, 791 (2007) (citation omitted).[8] Thus, although I acknowledge that SBC committed a few ULPs, the

---

[8]I acknowledge that some of our sister circuits have adopted a presumption that the commission of any ULP taints subsequent expressions of employee disaffection, even without proof of causation. *See, e.g.*, *Columbia Portland Cement Co. v. NLRB*, 979 F.2d 460, 465 (6th Cir. 1992) (citing Fifth and Sixth Circuit cases requiring only that a ULP "reasonably tended to contribute to employee disaffection" and rejecting the need for a stricter causal showing). However, I would follow the D.C. Circuit's approach, which insists on direct proof of a causal nexus between alleged ULPs and a union's loss of majority support. The former approach, adopted by the Board, would allow any ULP, no matter how trivial, to thwart decertification. The folly of this approach becomes clear by imagining, for example, that the only unfair labor practice SBC committed was replacing the break-room window with plywood. Certainly, no one would find this to be a sufficient basis for concluding that SBC caused a loss of union support, but the Board's approach requires precisely that result.

question is not whether the Company engaged in unfair labor practices; it is whether there is substantial evidence showing that these labor practices caused or reasonably could have caused employee disaffection with the Union.

I believe that the Board committed two errors in finding such a causal nexus here. First, the Board ignored our decision in *McKinney*, which found that BCTGM had lost majority support long before the May 2012 decertification petition. *See* 786 F.3d at 1124. If the Union already had lost majority support, it is unclear to me how SBC could have caused this disaffection through subsequent acts. Second, although the ALJ decision correctly identified the correct framework for analyzing causation based on the oft-cited opinion in *Master Slack Corp.*, 271 N.L.R.B. 78, 84 (1984), its analysis was conclusory at best, and neither the Board nor the court offer any additional basis for finding causation.

*a. Eighth Circuit precedent confirms pre-ULP loss of majority support*

"[E]vidence that employee disaffection arose prior to, and independently of, the [employer's] unfair labor practice conduct is relevant [to the inquiry into causation]" and thus the Board has an obligation to consider it as adverse evidence. *Lexus of Concord, Inc.*, 343 N.L.R.B. at 852-53. In *McKinney*, we found that "the unrefuted evidence . . . indicate[d that] a majority of Southern Bakeries' employees ha[d] not supported the Union since at least May 2012 when Hankins circulated his first petition." 786 F.3d at 1124. This petition was signed by 59 percent of unit employees. Additionally, dating back to 2009, SBC workers struggled to oust the Union with steadily growing momentum. This undisputed history demonstrates the Union lost majority support prior to May 2012. The Board failed to adequately address this adverse evidence, thereby calling into question its causal determination.

While *McKinney* did not find it immediately necessary to "resolve whether the Company's allegedly unlawful activities [before the 2012 decertification petition]

caused the employees' disaffection," *id.*, it did note that "the Director has not pointed to evidence suggesting the 2012 petition is not a genuine reflection of employee sentiment," *id.* at 1124 n.5. I believe this still to be the case. In attempting to undermine the petition as a valid expression of employee will, the court latches onto the only ULP alleged to have occurred prior to May 2012—the temporary bar on BCTGM representative Cesar Calderon's access to the bakery. *See ante* at 20-21. This, the court suggests, was sufficient to cause the employee disaffection that gave rise to the decertification petition. *See ante* at 21. As an initial matter, based on my analysis in the previous section, I do not believe that substantial evidence supports the Board's finding that the restriction on Calderon's access was an unfair labor practice. However, even if it was a ULP, I do not believe that the Union lost majority support simply because one of its representatives was absent for a few weeks—if so, its foothold at SBC was tenuous indeed. Therefore, *McKinney* demonstrates that BCTGM lost majority support irrespective of any ULP committed after May 2012, and the Board failed to adduce substantial evidence undermining that conclusion.

### *b.* Master Slack *factors*

Separate and apart from *McKinney*, I disagree with the Board's finding that substantial evidence established a causal nexus between unfair labor practices and employee disaffection. This is especially true given that the ULPs actually supported by substantial evidence are fewer and much less severe than what the Board originally found. Based on my analysis, I believe that SBC committed only three ULPs that could have affected the June 2013 withdraw petition: (1) creating an impression of surveillance, (2) interrogating several pro-Union employees, and (3) disciplining those same employees. These three ULPs are simply too isolated and minor to have caused the Union's loss of majority support. However, even assuming that the court is correct in upholding the additional three ULPs of threatening plant closure, promising benefits, and promulgating an unlawful rule, the Board still failed to meet

its burden of adducing substantial evidence to show a causal nexus between these labor practices and employee disaffection.

The Board did not even engage with the issue of causation in its decision, instead adopting the ALJ's analysis of the issue in its entirety. The ALJ began by correctly identifying the *Master Slack* factors as the governing approach for deciding whether a causal relationship exists. Under this framework the Board considers: "(1) the length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union." *Master Slack*, 271 N.L.R.B. at 84. However, the ALJ dedicated a mere four sentences to its causal analysis, which included little more than a conclusory recitation of the alleged ULPs. Without a deeper examination of how the Company's actions could have influenced the employees, I cannot agree with the court's bald declaration that the ALJ's causal-disaffection determination was supported by substantial evidence. *See ante* at 20. Indeed, a fuller *Master Slack* analysis suggests the opposite conclusion.

First, the length of time between the alleged ULPs and the circulation of the withdrawal petition weighs in favor of the Union. Although there is some uncertainty as to what constitutes a sufficiently short amount of time, *compare Columbia Portland Cement Co. v. NLRB*, 979 F.2d 460, 465 (6th Cir. 1992) (holding violations within one year had sufficient temporal proximity), *with Tenneco*, 716 F.3d at 649 ("[A] lapse of months fails to support, and typically weighs against, a finding of close temporal proximity."), it is clear that a strong temporal nexus exists where an employer's unlawful conduct was ongoing at the time of the petition, *see Goya Foods of Fla.*, 347 N.L.R.B. 1118, 1121 (2006), *enforced*, 525 F.3d 1117 (11th Cir. 2008). I agree with the Board's finding that SBC violated section 8(a)(3) in March and May

2013, just before the withdrawal petition was circulated. Thus, temporal proximity supports the Board's finding of a causal nexus, at least for some of the ULPs.

The second and third factors—the nature of the violations and their likelihood to cause employee disaffection—cut against finding a causal nexus. The ULPs here are so innocuous that they could not have had a lasting impact on employees or caused widespread loss of Union support. Moreover, neither the ALJ nor the court point to evidence that employees were even aware of the offending labor practices. Instead, the ALJ relied on sheer speculation to bridge the gap between the charged ULPs and employee's choice by simply pronouncing that SBC's unfair labor practices were "so voluminous and egregious that they naturally spawned significant disaffection." This approach plainly fails to establish "specific proof of a causal relationship." *See Champion Enters.*, 350 N.L.R.B. at 791. Even assuming that SBC committed all of the ULPs that the court upholds, the Board failed to produce substantial evidence suggesting that these practices had an effect sufficient "to cause a large majority of the employees to sign a decertification petition."[9] *Tenneco*, 716 F.3d at 650-51. Compared with instances where employers terminated employees, refused to bargain with a union, or unilaterally granted benefits to employees, the

---

[9]Although there is precedent indicating the coercive nature of several of these ULPs, I do not believe such violations can serve as *per se* proof of causation. This is especially true where, as here, there is evidence that most employees were not even aware of the practices or at least of their alleged anti-union impetus. For example, SBC did not make a public example in disciplining the pro-Union employees, and Hankins testified that their names never came up during the withdrawal-petition process. Similarly, although there was an ongoing dispute about the Union's access rights, there is nothing in the record showing that BCTGM was ever denied access for legitimate purposes or that the alleged limitations "actually prevented communications between the employees and the Union." *See Tenneco*, 716 F.3d at 650-51. The Union was even provided with a list of the employees eligible to vote in the election and thus had the means of contacting them directly, unlike *Tenneco*.

Board's attempt at bundling a group of fairly minor ULPs to create the illusion of a coercive atmosphere holds little water.

The fourth factor—the effect of unlawful conduct on union membership—also cuts in favor of SBC because the Board again failed to identify evidence linking the impression of surveillance or disciplining of three employees to the Union's loss of majority support. The Board's reliance on the fact that Union support declined after a few alleged ULPs confuses temporal correlation with causation, "rest[ing] more on suspicion than on reasonable inference and upon resort to that shopworn logical fallacy, *post hoc ergo propter hoc*." *See Riveredge Hosp.*, 205 N.L.R.B. 931, 935 (1973). Once again, even accepting the additional ULPs the court upholds, there is no evidence of causation beyond mere temporal correlation. Indeed, in light of the years-long trend of diminishing support for BCTGM, it is difficult to find that the ULPs had any effect on employee sentiment. Thus, nothing more than pure inference justifies the conclusion that the ULPs caused employee disaffection with the Union.

Despite the lip service paid to the *Master Slack* factors, the ALJ seemingly rested its causality determination on the same paternalistic assumption that undergirds many NLRB decisions in this context—that employees are incapable of navigating the election process and making a reasonable, independent decision that advances their own best interest. Admittedly, there can be a fine line between coercion and persuasion in the context of an employer-employee relationship, and employers certainly are capable of unfairly influencing employee sentiment through ULPs. *See, e.g.*, *UARCO*, 286 N.L.R.B. at 79 ("[T]he Board has often found that employees, who are particularly sensitive to rumors of plant closings . . . take such hints as coercive threats rather than honest forecasts."). Nevertheless, "[i]t is the very essence of election campaigning . . . to convince the voter not to support the other party," *Mediplex of Conn., Inc.*, 319 N.L.R.B. 281, 289 (1995), and an employer's ULPs should not be assumed to have caused employee disaffection unless there is evidence that the specific labor practices influenced, or reasonably could have influenced,

employees' choice. Attempts to persuade frequently involve disparaging the other side's position, and we must give unions and employers latitude to engage in a spirited debate given the importance of the issues at stake. *See, e.g.*, *MikLin Enterprises, Inc. v. NLRB*, 861 F.3d 812, 837 (8th Cir. 2017) (en banc) (Kelly, J., dissenting) ("By limiting the content of employees' communications to attacks on the employer's labor practices . . . the court deprive[s] employees of . . . their most cogent argument . . .[,] dampen[s] the ardor of labor debate[,] and truncate[s] the free discussion envisioned by the Act." (quotations omitted)).

When coupled with the findings from *McKinney* showing that a majority of employees stopped supporting the Union well before most of the alleged ULPs, the Board utterly disregarded "material evidence that belie[d] any causal relationship between the Company's unfair labor practices and the employees' petition for decertification" and failed to satisfy the *Master Slack* factors. *See Tenneco*, 716 F.3d at 649. Based on this record, I do not believe that there is substantial evidence of a causal relationship between SBC's unfair labor practices and the Union's loss of majority support. Therefore, I would not enforce this portion of the Board's order.[10]

## III.

The Board's decision suggests that SBC can neither reference the potential negative economic impacts of retaining the Union "regardless of the truth of those claims because it will upset the tranquility of the voter," *Mediplex*, 319 N.L.R.B. at 289, nor commit even a single ULP without automatically trammeling the right of employees to rid themselves of an unwanted Union. Unfortunately, what often gets lost in disputes like this are the unique interests of employees, as distinct from either

---

[10]Based on the foregoing analysis, I reject the Board's determination that the wage increases violated section (8)(a)(5), as SBC was no longer obligated to bargain with the Union when it granted the raises. *See ante* at 17 n.4. Accordingly, I also would not enforce this portion of the Board's order.

those of the companies or unions themselves, despite the NLRA's clear mandate "to protect the rights of individual employees." 29 U.S.C. § 141(b). And because either the Union or SBC may be more closely aligned with those interests depending on the circumstances, we should be more concerned with enabling employees to "recogniz[e] campaign propaganda for what it is" rather than protecting them from the exchange of ideas. *See U-Haul Co. of Nevada, Inc.*, 341 N.L.R.B. 195, 195 (2004). In fact, in the present case, there is good reason to believe that the employees were more sophisticated than most regarding the decision of whether to retain union representation, as they had been through a previous decertification election in 2009 and witnessed firsthand that SBC did not close its doors or otherwise retaliate after BCTGM prevailed.

This case "demonstrates the lengths to which the Board will go to contort an evenhanded Act into an anti-employer manifesto," *DirecTV, Inc. v. NLRB*, 837 F.3d 25, 47 (D.C. Cir. 2016) (Brown, J., dissenting). Rather than checking this agency overreach, the court's decision today rubber-stamps a bargaining order that sacrifices the will of employees for the sake of union incumbency.

_____